[No. S004604. Crim. No. 23519. Jan. 10, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID EDWIN MASON, Defendant and Appellant.

COUNSEL

Charles C. Marson, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White and Richard B. Iglehart, Chief Assistant Attorneys General, John H. Sugiyama, Assistant Attorney General, Dane R. Gillette, Ronald E. Niver and Catherine A. Rivlin, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

PANELLI, J.—

## I. INTRODUCTION

A jury convicted defendant David Edwin Mason of the murders of Joan Picard, Arthur Jennings, Antoinette Brown, Dorothy Lang, and Boyd Johnson, each in the first degree. (Pen. Code, § 187.)[1] As special circumstances, the jury found that defendant had murdered Picard, Jennings, Brown, and Lang while engaged in the commission of robbery (§ 190.2, subd. (a)(17)(i)) and that defendant had in the same proceeding been convicted of more than one offense of murder in the first degree (*id.*, subd. (a)(3)).[2]

---

[1] All further statutory citations are to the Penal Code unless otherwise noted.

[2] The jury also convicted defendant of robbing (§ 211) Picard, Jennings, Brown, and Lang, and of burglarizing each of their residences (§ 459). As enhancements to these crimes, the jury found that each of these four victims was over 60 years old (§ 1203.09) and that defendant personally inflicted great bodily harm on each (§ 12022.7).

The original jury failed to reach a verdict on penalty. A second jury, on retrial of the penalty phase, imposed the sentence of death. We affirm.

## II. FACTS

### A. *Guilt Phase*

Between March 9, 1980, and December 7, 1980, defendant entered the homes of, and robbed and strangled, four elderly residents of Oakland: Joan Picard (73), Arthur Jennings (83), Antoinette Brown (75), and Dorothy Lang (72). On February 4, 1981, defendant was arrested. On May 9, 1982, defendant murdered Boyd Johnson, an inmate in the Alameda County jail.

### 1. *The Oakland Murders*

The prosecution proved that defendant murdered Picard, Jennings, Brown, and Lang primarily through his own admissions. Several weeks before he was arrested, defendant confessed to the four murders in a tape recording that he prepared for his family. Defendant inscribed the tape cassette with the label "David E. Mason - Epitaph." After he was arrested, defendant provided detailed information about the murders to police in four lengthy statements. He also led representatives of the district attorney's office to the places where the murders had occurred.

### a. *The Murder of Joan Picard*

In statements to the police, defendant described Joan Picard's murder in detail. Defendant had known Picard seven or eight years earlier, when he was a teenager. He had done odd jobs for her, such as cleaning and gardening, and considered her a friend. On occasion, Picard invited defendant into her home for refreshments, to talk about religion, and to show him her coin collection. Picard, who was concerned about burglars, also showed defendant her alarm system and its panic buttons.

On March 6, 1980, low on funds, defendant remembered Picard and her coin collection. He took a bus to her home and knocked on her door. Picard, now 73 years old, remembered him and invited him in. Defendant pulled out an ice pick, told Picard that he planned to rob her, and instructed her not to scream or run. Initially, Picard did not believe what defendant was saying. To convince her that he was serious, he told her, falsely, that he was a drug addict.

Defendant led Picard upstairs, where he found $3 under a stack of newspapers in the bedroom. When she attempted to reach the panic button, he

pulled her back and choked her until she lost consciousness. When Picard regained consciousness, she told him to take everything. According to defendant, she said: "I'd rather let you have everything [than] to believe that you're doing this." When defendant began to search the house, Picard tried to escape. Defendant tied her wrists with an electrical cord and told her not to move. After finishing his search, which produced the coin collection, defendant returned to Picard. Afraid that she would identify him, he killed her by tightening a ligature around her neck.

Picard's daughter found the body two days later. It had been placed in the pantry behind a closed door. Physical evidence from the crime scene substantially corroborated defendant's later statements. Picard's body was on the floor. Around her neck was a wire, twisted tight with a pencil to form a tourniquet. The larynx and hyoid bones in her neck had been fractured, probably by manual strangulation. Asphyxiation due to strangulation was the cause of death. Picard's hands were tied in the front with an electrical cord that had been cut from a clock radio. The clock radio had stopped at 12:29 p.m. Bruises on her face, neck, chest, and arms indicated a severe beating before death. There were bloodstains in the living room, on the stairway, and in the bedroom. The only clothes left on the body were a blue skirt and a brassiere. A sweater had been forcibly removed; fragments of the buttons were scattered on the floor.

Picard's daughter testified that her mother's coin collection was missing. Defendant admitted selling the coins. A pawnbroker testified that he purchased them from defendant for $85 on March 6, 1980, at 4:40 p.m.

Testifying on his own behalf at trial, defendant admitted involvement in Picard's murder, as he had in the "Epitaph Tape" and in his statements to police. At trial, however, defendant repudiated his earlier confessions and claimed that he had robbed Picard together with an accomplice, Doug Denard. According to defendant's trial testimony, Denard killed Picard against defendant's wishes while defendant was out of the room.

### b. The Murder of Arthur Jennings

In his statements to the police defendant also described his murder of 83-year-old Arthur Jennings. As a teenager, defendant had known Jennings as "Niko," someone who would trade money for sexual favors. Defendant had met Jennings for this purpose several times, most often in Jennings's car but twice in his cottage near defendant's junior high school.

On August 18, 1980, looking for "something to do," defendant knocked on Jennings's door. When the door opened defendant pushed it in, causing

Jennings, who walked with a cane, to fall backwards onto the floor. Defendant rushed in and fell on top of him. Jennings swung at defendant and struggled. Defendant punched Jennings, put his hands around Jennings's neck, and strangled him. When Jennings stopped breathing, defendant ransacked the house. Defendant left with Jennings's World War I military service ring and about $16.

A Meals-on-Wheels driver had delivered a meal and spoken to Jennings about 10:30 a.m. The next day, the driver discovered the body lying on a bed in the front room. Physical evidence substantially corroborated defendant's later statements about the murder. Jennings's spine had fractured in a backwards fall, and he had been severely beaten before death. There were bruises on his face, head, neck, and upper body. His larynx and hyoid bones had multiple fractures. The cause of death was asphyxiation due to manual strangulation. The coroner estimated that Jennings had eaten about an hour before he died, thus placing the time of death about 11:30 a.m.

At trial, defendant repudiated his earlier statements, claiming that he had never met Jennings and did not kill him. Defendant also presented the alibi that he had been working at Thrift Town, a secondhand shop, on the day Jennings died. Defendant's time card was punched in at 12:31 p.m. and punched out at 9:02 p.m. In rebuttal, the People showed that others could have punched defendant's card. Defendant's brother, who also worked at Thrift Town, punched out for lunch at 12:31 p.m. Karen Worden, defendant's friend, punched out at 9:03 p.m.

c. *The Murder of Antoinette Brown*

Defendant killed Antoinette Brown, a 75-year-old widow living alone, on November 16, 1980.

The last person who saw Brown alive was Wayne Anderson, a neighbor. About 4 p.m. on Sunday, November 16, Brown brought Anderson some homemade cookies, and he invited her to Thanksgiving dinner. When Anderson returned from work the next day he saw that Brown's Sunday and Monday newspapers were still at her door. He knocked on her door and telephoned but got no answer. Because Brown still had not collected her newspapers on Tuesday, Anderson called Brown's sister, who had a key to the apartment.

Inside the apartment, Anderson and Brown's sister found the body face down in the bedroom. Around Brown's neck was a knotted ligature fashioned from a silk undergarment. Brown's body was clothed, but her slip had been pulled up above her waist and her brassiere had been pulled down. The

autopsy surgeon determined that Brown had died of asphyxiation due to strangulation. Brown had also been beaten before death. There were bruises, scrapes, and cuts over most of her body. In addition, Brown's rings and purse had been taken from the apartment.

A second neighbor, Paula White, testified that she briefly saw a young, male stranger leave the elevator on the first floor at about 4 p.m. During their investigation, police asked White to select a photograph of the stranger from a set of six. She selected photographs of defendant and one other person.

In his statements to the police, defendant occasionally confused Brown's murder with that of Dorothy Lang, his next victim. Defendant did, however, provide many accurate details. Defendant correctly remembered that the murder had occurred about 4 p.m. Defendant also correctly remembered that Brown had worn a dark colored dress with a flowered design, that she had driven a full-sized American car, that her apartment building had four floors and a balcony facing the street, that she had lived in the front apartment on the second floor, and that the underground garage, which was not visible from the street, had a cord that opened the door automatically. Defendant also drew for police an accurate diagram of Brown's apartment and pointed out to them, from the street, the apartment in which she had died.

At trial, defendant denied any involvement in Brown's murder and testified that he had been in Oroville, approximately 145 miles away, on the evening of November 16. At the time, defendant was living with Robert Groff, whom he later killed, in a trailer park on the Feather River. Mr. Fry, Groff's neighbor, testified that he saw defendant in the trailer park several times on the evening of Sunday, November 16, and helped him to install a new water heater in Groff's trailer. Mrs. Fry, however, testified that her husband was mistaken about the date. According to Mrs. Fry, the couple drove to her sister's house in Yuba City on the 16th. They did not return until late that night and left for a week's vacation early the next morning. It was the next weekend, November 23, on which Mr. Fry helped defendant install the new heater.

### d. *The Murder of Dorothy Lang*

Dorothy Lang lived alone in a second-floor apartment on Fruitvale Avenue in Oakland. She was 72 years old.

Defendant killed Lang on December 6, 1980. About 9 p.m. that evening, Lang's downstairs neighbors and friends, Teresa and John Santos, heard a

loud thump and scuffling noises coming from above. Half an hour later, the Santoses heard loud breathing and things being dropped on the floor. Mrs. Santos telephoned Lang and knocked on her door but got no answer. Returning to her own apartment, Mrs. Santos stood in her bedroom, directly underneath Lang's, and called out, "Dorothy, Dorothy, are you all right?" A voice answered, "Yes." Immediately thereafter the Santoses heard footsteps, followed by the sound of Lang's screen door slamming shut. The Santoses assumed Lang had gone to bed.

The next morning the Santoses went upstairs to deliver Lang's Sunday morning paper. Seeing her door ajar and fearing that something was wrong, they entered. Lang's body was lying on the bedroom floor. It appeared that she had fled from the door to the bedroom; her glasses and a single slipper were lying near the door. Her head was covered with a bloodstained bedspread, and a crescent wrench lay nearby. Lang's body was naked from her chest to her ankles. Her sweater and brassiere had been pushed up to the throat, exposing her breasts. Beside Lang's body was a torn pair of pants. Small, valuable items were missing from Lang's apartment, including an old-fashioned wedding band, an engagement ring, lapel pins, and earrings. Some ring boxes in her bedroom had also been emptied.

The autopsy showed that Lang had died of asphyxiation due to manual strangulation and chest injuries. Before she died, she had been beaten on the head with the crescent wrench. Ribs had been broken, probably by someone kneeling on her chest, and she had bruises all over her body. Her vaginal tissue was slightly cut and bruised.

As already mentioned, defendant in his statements to the police occasionally confused the details of Lang's murder with that of Brown. Defendant did, however, provide many accurate details. He correctly remembered that Lang's apartment was near a Rexall drugstore, a funeral parlor, and a park, and that he had to jump over a little wall to approach the apartment building from the side. Defendant also remembered several accurate details of the killing. In particular, defendant remembered feeling "really nervous" while in Lang's apartment, "thinking that her neighbors had heard something" while Lang was running and yelling. Defendant also described seeing Lang at the door to her apartment, following her as she ran back towards the bedroom, hitting her, leaving her in the bedroom, and taking her "[o]ld wedding ring" and "[s]ome other rings."

At trial, defendant denied involvement in Lang's murder and testified that he had spent December 6 in Berkeley at the house of a friend, Patricia Buckley. Buckley did not remember defendant leaving the house between 5

and 10 p.m. Defendant, however, testified that he had left the house to go shopping and to eat dinner with Buckley's 11-year-old daughter, Kathy.

2. *Defendant's Flight from Police and the Epitaph Tape*

On January 6, 1981, four weeks after murdering Dorothy Lang, defendant fled from Alameda County sheriff's deputies in a high-speed automobile chase. Deputies DeCost and Fixel were patrolling Interstate Highway 580 between Hayward and Castro Valley. Defendant passed the patrol car in a Dodge Charger, going about 80 miles per hour. When the patrol car pursued, defendant left the freeway and entered a residential area, making several turns into side streets. Eventually he stopped. When the patrol car stopped, too, defendant sped away at 70 miles per hour, still in a residential area. As the chase approached a dead end, defendant decelerated and jumped out of the car. He hit the ground running and escaped on foot. The deputies saw defendant's face and, in the car, found a work order for auto repairs bearing the name "D. Mason" and the address of defendant's parents.

Five days later, on January 11, 1981, the Oakland Tribune published an article entitled "Murder, Epidemic of Violence." The article listed, in chronological order, 145 unsolved homicides that had occurred in Oakland during 1980. For each murder, the article listed in summary fashion the date of the killing, the victim's name, address, and age, the manner of killing, the probable motive, and whether there were suspects.

The newspaper article did not provide further details of the crimes, such as the condition of the bodies or what items had been taken from the victims' dwellings. About the murders involved in this case, the article listed only the following: "[No.] 23/ Mar. 9/ Joan Picard, 69/ 3826 Fruitvale Ave./ Strangled, burglary/ No suspects/ . . . [No.] 84/ Aug. 10/ Arthur Jennings, 83/ 2826 Carmel St./ Strangled, burglary/ No suspects/ . . . [No.] 123/ Nov. 18/ Antoinette Brown, 79/ 3952 Harrison St./ Strangled, no motive/ No suspects/ . . . [No.] 132/ Dec 7/ Dorothy White, 72/ 1621 Fruitvale Ave./ Strangled, no motive/ No suspects . . . ." The article incorrectly reported Lang's last name as White.

On January 22, Officer Larry Schuchert visited defendant's parents' home in San Lorenzo and talked with Margie Mason, his mother, and Mark, one of his brothers. Mark gave Officer Schuchert a cassette tape labelled "David E. Mason - Epitaph." Mark said that defendant had given him the tape a few days earlier and asked him to keep it until something happened to him. With the family's permission, Schuchert played the tape. Defendant's family listened and recognized his voice.

On the tape, defendant spoke of his life and philosophy, sent messages to his family, and predicted that he would die in a shoot-out with police. Defendant also confessed to a long string of violent crimes, "guess[ing] it might be . . . of interest to the police" who have "lots of things that need to be solved." Referring to the Oakland Tribune article about unsolved murders, defendant stated that he could "clarify some of their mysterious haps . . . in Oakland . . . on the 187's of the Penal Code. Uh, it was number 23, number 84, number 123 and 132 [pause] I'm sure of. You understand what numbers I related?"

Defendant was arrested 10 days later, on February 4, 1981. After hearing and acknowledging his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), defendant gave four detailed statements to police. In the statements, defendant admitted that he had killed Picard, Jennings, Brown, Lang, and one other person, and committed several burglaries and armed robberies. That evening, defendant took a deputy district attorney, an investigator, and a videotape operator to the places where he had killed Picard, Jennings, Brown, and Lang.

### 3. *The Murder of Boyd Johnson*

On May 8, 1982, defendant was being held in the Alameda County jail pending trial. Boyd Johnson arrived at the jail that evening and died there the next day.

Johnson had been arrested for the murder and rape of Patricia Garcia. Earlier that day, Johnson had led police in Shasta County to Garcia's body. A television camera crew accompanying the party had taped Johnson's emotional confession, which implicated other persons.

When Johnson arrived at the jail, sheriff's deputies prepared to lock him in "F Tank," the cell block in which it was customary to hold informants. On that day, F Tank was already occupied by four inmates: Quentin Shorter, Nathaniel Yancey, Maurice Grant, and defendant. Defendant, alone, was not an informant. The deputy sheriff on duty was Barry Silva. Johnson, learning that he was not to be held alone in protective custody, became verbally abusive and demanded that Deputy Silva call Sergeant Neal, who was investigating the case. Despite Silva's warning, Johnson also insisted on carrying Sergeant Neal's business card with him into F Tank.

The next day, about 2:30 p.m., defendant and Shorter asked Deputy Silva who Johnson was. Shortly thereafter, Silva saw a short announcement on television that Johnson's confession would be broadcast on the evening news. Silva called the telephone in F Tank and told defendant that, "if he were to pay attention to the news, his questions would be answered."

According to Yancey, defendant hung up the telephone and said, "[i]t's all right to kill him," and "watch the news." Johnson, who had taken a sleeping pill, slept through the broadcast.

After the news had ended, Silva telephoned F Tank again. Defendant told Silva that there might be "a third degree session" when Johnson awoke. Silva understood this to mean that defendant and others might threaten Johnson to obtain further information. Silva was more concerned about defendant than the other inmates, however, because defendant had been involved in previous acts of violence in the jail. Silva told defendant that he "didn't want any trouble in the jail and certainly not on our shift."

At that point defendant, Shorter, and Grant discussed killing Johnson. Defendant said that he had known Patricia Garcia and thought that he knew Johnson, too. Referring to prison documents that depicted defendant as a member of the Aryan Brotherhood, Shorter told defendant that he "would get a promotion" for the killing. Grant returned to his cell, promising secrecy. Yancey had already left, wanting nothing to do with the plan.

Shorter, according to his own testimony, went with defendant to Johnson's cell. Defendant was carrying a towel, knotted into a garrote. Johnson was asleep on the bed, lying on his back. Defendant jumped on Johnson's chest and wrapped the garrote around his neck. Shorter held Johnson's legs when he began to kick. When Johnson stopped moving, defendant and Shorter decided to make the incident appear to have been a suicide. They carried the body to the shower and hung it from a heavy shower rod with the towel. As they were hanging the body, Johnson suddenly began to bleed onto both men. They disposed of their clothes. Defendant put his jail-issue pants into the laundry bag but kept his tennis shoes, on which small blood spots remained.

Grant and Yancey corroborated Shorter's testimony. Both men testified that they saw defendant and Shorter approach Johnson's cell, heard the ensuing struggle, and saw the two assailants hang Johnson in the shower.

At 10:30 p.m., a security officer noticed that Johnson was not in his cell but assumed that he was showering. Defendant, expressing surprise that the body had not been found, telephoned the guards to report that a man was hanging in the shower. Responding to the call, deputies found defendant, holding up Johnson in a feigned effort to relieve the pressure on his neck. Defendant helped the deputies pull Johnson out of the shower and perform cardiopulmonary resuscitation on the dead body.

The autopsy showed that both the ligature and the hanging had contributed to Johnson's death. Johnson had also been beaten about the face and

head while still alive. In their investigation, deputies found Johnson's blood on defendant's pants and shoes. A towel in defendant's cell also bore traces of Johnson's blood. Defendant had scratches and bruises on his face, knuckles, arms, and chest, and his fingers were swollen. Scrapings from Johnson's fingernails produced traces of type O blood, defendant's type.

The prosecution attempted to prove that defendant later told Hershell Moore, another inmate, that defendant "took Boyd Johnson to the gallows because he was a snitch." When called to testify, however, Moore denied having heard the remark. An investigator for the district attorney's office, called to impeach Moore, testified that Moore had repeated defendant's statement during an unrelated investigation.

The defense portrayed the killing as the outcome of a fight provoked by Johnson's insults and suggestions by Deputy Silva that Johnson should be killed. Defendant testified that he had known Garcia, Johnson's victim. On the evening he arrived at the jail, Johnson was making sexual and derogatory remarks about Garcia and bragging about the rape. Defendant asked him not to do so. Later, according to defendant, Silva telephoned, saying that he was "surprised that there was no activity in F Tank" because "the morgue [was] not that far away." That evening, defendant again heard Johnson's voice down the hall, discussing Garcia and insulting defendant. Defendant confronted Johnson and they fought. Defendant killed Johnson with a choke hold.

### B. *Penalty Phase*

At the penalty phase, the prosecution presented the circumstances of the five charged murders as factors in aggravation. (§ 190.3, subd. (a).) In addition, the prosecution proved one prior felony conviction (*id.*, subd. (c)), and twelve instances of criminal conduct involving violence or an express or implied threat of violence (*id.*, subd. (b)): one uncharged homicide, one attempted robbery, four armed robberies, one instance of possession of a weapon by an ex-felon, three instances of possession of weapons as an inmate, and two attempts to escape from jail.

### 1. *Aggravating Evidence*

#### a. *Prior Felony Conviction*

*Virginia Janssen: Robbery and Assault With a Deadly Weapon*

On July 8, 1977, defendant entered the Western Welding Supply Company in San Leandro and asked Virginia Janssen, the clerk, for some items.

When Janssen sat down to prepare an invoice, defendant stabbed her through the back with a 10-inch-long ice pick. Defendant then ordered her to empty the safe, the cash box, and her purse. Defendant told her that, if she identified him to police, he would return to kill her after leaving prison. After wiping his fingerprints from things he had touched and retrieving the ice pick, defendant left the store with about $270.

The next day, while hospitalized for the stab wound, Janssen identified defendant in a photographic show-up. Shortly thereafter, having learned that police were looking for him, defendant surrendered and confessed to the robbery and assault. After pleading guilty to those crimes, he spent two years in state prison. On July 13, 1979, he was released on parole.

### b. *Prior Criminal Activity*

The first six instances of prior criminal activity occurred before defendant was arrested and taken into custody. Defendant admitted these acts in the "Epitaph Tape," in his subsequent statements to police, and in his own testimony at trial.

### (i) *Donald Gion: Attempted Robbery*

On March 20, 1980, 14 days after murdering Joan Picard, defendant attempted to rob Donald Gion. Gion arrived at his home in Fremont shortly after midnight. The garage door was already open. Gion parked his truck in the garage, got out, and shut the door. At that point Gion realized that another man was in the garage with him. Defendant, wearing a nylon stocking over his head and carrying a .38-caliber pistol, approached Gion. Gion grabbed a garbage can lid, swung it at defendant, and shouted for his wife to call the police. Defendant struck Gion on the head with the pistol and demanded money. Gion's wife, responding to her husband's screams, opened the garage door. Defendant fled.

On August 18, 1980, five months after this incident, defendant killed Arthur Jennings. On November 16, 1980, he killed Antoinette Brown.

### (ii) *Robert Groff: Murder*

Defendant killed Robert Groff on November 27, 1980. At the time of the trial in this case, a complaint charging defendant with murder was pending in Butte County.

In his own words, defendant had made a practice of "hustling gays," receiving money and a place to live in exchange for sexual favors.

Defendant met Groff in a gay bar in Hayward in April 1980 and, shortly thereafter, moved into Groff's home. Groff, whose business was raising purebred dogs, initially employed defendant as a kennel boy. Over time, Groff gave him legal title to checking accounts, vehicles, and registered dogs.

Defendant left Groff's home in July 1980 when he discovered that Groff had infected him with herpes. Groff moved his trailer to Oroville. In September, however, defendant travelled to Oroville and moved in again with Groff.

The killing occurred on Thanksgiving Day, 1980. Groff, who had been drinking, said that "all [defendant] wanted was the dogs." Groff produced a gun and said that he would shoot defendant unless he left. Defendant took the gun away, left the trailer, and went for a drive. When he returned, Groff was asleep. Defendant had a few drinks of Groff's whiskey, went to his room, and shot him in the face. After a night's sleep, defendant got up, poured whiskey on the body to retard decomposition, and covered the body with blankets. He then left, taking along checks on Groff's bank accounts, which he forged and cashed, some jewelry, and the shell casing from the bullet that had killed Groff.

### (iii) *John and Arlene Vasko: Robbery*

About noon on December 10, 1980, four days after murdering Dorothy Lang, defendant knocked on the door of John and Arlene Vasko's home in Castro Valley. Defendant pretended to be selling firewood. Mr. Vasko expressed interest, and defendant said that he would return later in the day with his partner and the wood.

At about 6 p.m. defendant returned, alone. Because it was windy and cold, Mr. Vasko invited him inside to wait for his partner. As time wore on, the elderly couple gave him dinner and watched television with him. Defendant, using the telephone for purported calls to an answering service, offered various excuses for his partner's delay. After several hours, he produced a pistol and two pairs of handcuffs, said that he had no wood to sell, and handcuffed the Vaskos to a chair. He took some cash, a .22-caliber pistol, jewelry worth about $42,000, and a few gold coins. Defendant explained that Mr. Vasko's coin dealer, who was out of prison on parole, had told defendant that the Vaskos would have valuables.

### (iv) *Nina Agisheff/P & R Enterprises: Robbery*

On December 17, 1980, defendant robbed P & R Enterprises, a jewelry store in Menlo Park. Defendant told Nina Agisheff, the clerk, that he was

married, that his wife had put a deposit on a gold necklace for Christmas, and that he wished to pay the balance. Since there was no necklace marked with defendant's name, Agisheff showed him several others. Defendant drew a gun, ordered Agisheff to sit down, and took about $22,000 worth of jewelry. As he left, defendant threatened to shoot Agisheff if she followed.

### (v) *Ricardo and Laura Salas: Robbery*

On the evening of January 4, 1981, defendant and an accomplice, Steve Denard, robbed Ricardo and Laura Salas at their home in Medford, Oregon. Mr. Salas had just parked his car and stepped out when defendant pointed a gun at his head. The robbers, who had brought along a roll of packing tape for the occasion, bound the Salases to their bed. Defendant demanded information about a jewelry store that Salas owned. Salas gave defendant some information about the store's alarm system but told him that he would not be able to gain entry. Hearing this, defendant kicked Salas, held a pistol to his head, threatened to shoot him, and made him repeat the information about the alarm system.

Defendant told the Salases that his partner was going to the jewelry store. Defendant said that, if his partner did not call in 10 minutes to say that he had successfully entered the store, defendant would kill them both. Defendant left the room. After a long wait, the Salases decided that defendant had gone, freed themselves, and called the police. The robbers had taken the keys to the store and approximately $9,000 worth of the Salases' jewelry, including their wedding rings.

### (vi) *Celia Keener/Design Emporium: Robbery*

On the morning of February 3, 1981, defendant robbed the Design Emporium, a jewelry store in Clovis. He had been in the store earlier in the day, assertedly shopping for a Valentine's Day present. When defendant reentered the store, he was carrying a briefcase that contained a .25-caliber automatic pistol and a sawed-off, double-barrelled shotgun. Defendant drew the pistol, ordered Celia Keener, the clerk, to sit on the floor, and tied her wrists to the arm of a chair. Placing a "closed" sign in the window, defendant filled the briefcase with approximately $47,000 worth of jewelry. Defendant also took $760 in cash from the safe and from Keener's purse. Defendant allowed Keener to keep her wedding ring. As he left, defendant said: "It doesn't matter if you can i.d. me because they know who I am." "That's why I'm not hurting you."

### (vii) *Possession of Weapons by Ex-felon*

On February 3, 1981, members of federal and state law enforcement agencies had defendant under surveillance. Shortly before midnight, he

checked into a room at the Holiday Inn in Livermore. Police evacuated the floor. They arrested him the next morning without resistance as he stepped into the hall. Inside his room, the police found a loaded .25-caliber automatic pistol with a live round in the chamber, a loaded .12-gauge, sawed-off, double-barrelled shotgun, and additional ammunition for both guns.

### (viii) *Possession of Weapons in Jail*

While defendant was confined in the Alameda County jail, sheriff's deputies three times found weapons in his cell. On May 4, 1982, five days before defendant murdered Boyd Johnson, deputies found a double-edged razor blade hidden underneath his bunk. An inmate is not permitted to possess a razor blade unless it is locked in a special safety-razor holder.

Deputies found a second weapon in defendant's cell on August 6, 1982. The weapon, a homemade "shank," consisted of a straightened, sharpened, heavy-duty paper clip protruding from the end of the plastic barrel of a ballpoint pen, which had been melted at the end to hold the metal tip in place while stabbing.

Deputies found the third weapon on August 10, 1982, while escorting defendant to his cell. Defendant had just received a visitor and had taken with him from the visitor's booth a telephone cord with the heavy receiver still attached. Defendant surrendered the cord and receiver, which he had concealed under loose clothing, when deputies informed him that they planned to perform a strip-search.

### (ix) *Escape Attempts*

Defendant twice attempted to escape during trial. On July 17, 1983, sheriff's deputies discovered that defendant had sawed loose on two sides the metal screen that covered the window to his cell. Deputies found a jeweler's carborundum saw with homemade handles in a laundry room near defendant's cell. The screen was replaced. On August 23, deputies discovered that defendant had managed to make a new, three- by three-inch cut in the screen.

### 2. *Mitigating Evidence*

The defense presented five witnesses at the penalty phase: defendant, his juvenile probation officer, his mother, his father, and two of his sisters.

Defendant denied, as he had at the guilt phase, that he had personally killed Picard or been involved in the killings of Jennings, Brown, and Lang.

With regard to the killing of Groff, defendant emphasized that he had been drinking and upset by the accusation that he was only interested in Groff's material possessions. Defendant also discussed the "Epitaph Tape"[3] and his childhood.

The remainder of the defense case concerned defendant's childhood. Defendant testified that his parents, who were extremely religious, believed that a person was controlled either by God or Satan. Defendant and his siblings were compelled to spend most of their free time either at church or at home. The parents' approach to disciplinary problems was to "rebuke" Satan out of the offending child with prayers. They also resorted frequently to corporal punishment, usually in the form of blows with a switch. Defendant reported receiving over a hundred blows on two occasions. Defendant's mother also punished her children at times by choking.

Charlene and Nancy, two of defendant's adult sisters, largely confirmed defendant's testimony. They also criticized their parent's treatment of children and testified that they would not raise their own children in the same way.

Cynthia Ritenour, the juvenile probation officer formerly assigned to defendant, testified about the investigative report she had prepared when he was 14 years old. It was at that age that he was declared a ward of the court. His parents had initiated the proceeding on account of his uncontrollable behavior. Defendant had misbehaved chronically at school, set fires at home and at church, held a knife over his baby brother's crib, attempted suicide, and not responded to discipline. Unable to control him, defendant's parents had begun to lock him in his bedroom when they were away from home. They also installed bars over his bedroom window. In her report, Ritenour confirmed that defendant had reported extremely harsh treatment by his parents. However, Ritenour also expressed some doubts about his veracity. Noting his above average intelligence and reading ability, Ritenour concluded at the time that counselling might be helpful.

Defendant's parents testified about the remainder of his youth. After being declared a ward of the court, he spent the next few years at foster homes, residential treatment programs, and the California Youth Authority. After dropping out of school in the 11th grade, defendant spent 4 months in the Marine Corps. Shortly after his discharge, he was arrested for

---

[3] In the "Epitaph Tape," which had been played for the jury during the People's case, defendant described his crimes as "snatchin' a cheap thrill before I go" and said that "[n]obody's death ever stop[ped] me from doin' what I had to do." Defendant also said on the tape that "I don't regret anything. And there's no remorse for anything that I ever did in my life."

the robbery of Virginia Janssen. Defendant's parents attributed his problems to the state's failure to provide him with adequate counseling.

### III. GUILT PHASE ISSUES

#### A. *Denial of Motions to Sever*

##### 1. *The Johnson Murder*

Defendant contends that the trial court abused its discretion by denying his motion to sever the Johnson murder charge and that the resulting, consolidated trial on five murder counts caused gross unfairness. We disagree.

The People originally charged defendant with Johnson's murder in a separate information. Subsequently, the trial court granted the People's motion to consolidate that information with the prior information charging defendant with the murders of Picard, Jennings, Brown, and Lang. The trial court also denied a motion to sever.

█ We first consider the trial court's rulings on the motions for consolidation and severance, based on " 'the showings then made and the facts then known.' " (*People* v. *Johnson* (1988) 47 Cal.3d 576, 588 [253 Cal.Rptr. 710, 764 P.2d 1087], quoting *People* v. *Balderas* (1985) 41 Cal.3d 144, 171 [222 Cal.Rptr. 184, 711 P.2d 480].) We hold that the trial court did not abuse its discretion.

This case clearly met the statutory requirements for joinder because the five murders were of the same class. Under section 954, "[a]n accusatory pleading may charge two or more . . . different offenses of the same class of crimes or offenses . . . ." Because the statutory requirements for joinder were satisfied, defendant would have been able to defeat consolidation "only on clear showing of prejudice." (*Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 447 [204 Cal.Rptr. 700, 683 P.2d 699].) To show prejudice was, of course, his burden. (*People* v. *Bean* (1988) 46 Cal.3d 919, 938-939 [251 Cal.Rptr. 467, 760 P.2d 996].)

Defendant attempted to show potential prejudice by arguing (1) that evidence related to Johnson's murder would not be admissible in a separate trial on the murders of Picard, Jennings, Brown, and Lang, (2) that consolidation of a fifth murder count would inflame the jury, and (3) that the Johnson murder charge would not be a capital charge unless consolidated. We consider each argument in turn.

With regard to defendant's first argument, we readily assume that the evidence was not cross-admissible. However, "we have made clear on several occasions that cross-admissibility is not the sine qua non of joint trials." (*Frank* v. *Superior Court* (1989) 48 Cal.3d 632, 641 [257 Cal.Rptr. 550, 770 P.2d 1119]; see also *People* v. *Ruiz* (1988) 44 Cal.3d 589, 606 [244 Cal.Rptr. 200, 749 P.2d 854]; *People* v. *Bean, supra,* 46 Cal.3d at p. 938; *People* v. *Poggi* (1988) 45 Cal.3d 306, 321 [246 Cal.Rptr. 886, 753 P.2d 1082]; *People* v. *Walker* (1988) 47 Cal.3d 605, 623 [253 Cal.Rptr. 863, 765 P.2d 70]; *People* v. *Balderas, supra,* 41 Cal.3d at p. 173.) While we have held that cross-admissibility ordinarily dispels any inference of prejudice, we have never held that the absence of cross-admissibility, by itself, sufficed to demonstrate prejudice.

Defendant's second argument, that consolidation threatened to inflame the jury, is based on a misreading of our prior opinions on the subject. Defendant argues that each of the counts was inflammatory.[4] However, we have never adopted a rule that bars consolidation of multiple-murder counts simply because the defendant is alleged to have acted brutally in each. Instead, what we have held is that it may be error to consolidate an inflammatory offense with one that is not under circumstances where the jury cannot be expected to try both fairly. The danger to be avoided is "that strong evidence of a lesser but inflammatory crime might be used to bolster a weak prosecution case" on another crime. (*People* v. *Walker, supra,* 47 Cal.3d at p. 623; see also *Coleman* v. *Superior Court* (1981) 116 Cal.App.3d 129, 138 [172 Cal.Rptr. 86].) Consolidation did not create such a danger in this case because no murder count was significantly stronger or more inflammatory than the others.

Defendant's third argument, that consolidation would make the Johnson murder a capital crime, was simply incorrect. It is true that the only special circumstance charged in connection with Johnson's murder was that defendant had "in this proceeding been convicted of more than one offense of murder in the first or second degree." (§ 190.2, subd. (a)(3).) Defendant's argument, however, erroneously assumes that the People would have tried the Johnson murder, which occurred last in time, before trying the murders of Picard, Jennings, Brown, and Lang. There was no requirement that the People try the Johnson murder first. Moreover, a single murder conviction in a prior proceeding based on the killing of Picard, Jennings, Brown, or Lang would have permitted the People to amend the information regarding the Johnson murder to charge that defendant had been "previously convicted of murder in the first or second degree." (§ 190.2, subd. (a)(2).)

---

[4] To illustrate, the Johnson murder involved a strangling and the mock hanging of a corpse, and the Oakland murders involved the beating, strangling, and robbery of elderly victims.

In summary, defendant did not carry his burden to show prejudice. (*Williams* v. *Superior Court, supra*, 36 Cal.3d at p. 447.) Thus, the trial court did not abuse its discretion by consolidating the Johnson murder and denying defendant's motion to sever.

Regardless of the lack of potential prejudice, defendant argues that the trial court should nevertheless have exercised its discretion to sever the Johnson murder charge because joint trials did not serve judicial efficiency. We disagree. Consolidation usually promotes efficiency, and this case was no exception. Consolidation obviated the need to select an additional jury to try the Johnson murder. This can be a substantial benefit in a capital case; the initial jury selection in this case took over two months. Moreover, consolidation reduced by at least a year the delay in bringing the Johnson murder to trial. Finally, a separate trial on the Johnson murder, charged as a capital case (§ 190.2, subd. (a)(2)), would have involved presentation of evidence on the murders of Picard, Jennings, Brown, and Lang as circumstances in aggravation. (§ 190.3, subds. (b) & (c).)

Defendant argues that the costs of consolidation were substantial because "no accounting of the impact of this joinder on the economics of the judicial system would be fair without considering the costs of the struggle over joinder itself." In other words, defendant argues that "the cost of litigation was so high he should have won." We reject the argument. ■ A defendant can prevent consolidation of properly joined charges only with a "clear showing of prejudice" (*Williams* v. *Superior Court, supra*, 36 Cal.3d at p. 447), not by threatening to make litigation over the trial court's ruling expensive.

Defendant next contends that, even if the trial court did not abuse its discretion, consolidation of the Johnson murder charge caused such gross unfairness as to deprive him of a fair trial. (See *People* v. *Johnson, supra*, 47 Cal.3d at p. 591.) Defendant attempts to demonstrate gross unfairness by repeating his arguments regarding the absence of cross-admissibility, the consolidation of inflammatory charges, and the capital nature of the Johnson murder charge. However, the facts as shown at trial were not significantly different than the facts before the trial court at the time it ruled on defendant's motion to sever. Thus, the same arguments do not support a different result after trial.

Finally, defendant seeks to demonstrate that consolidation resulted in gross unfairness by characterizing the evidence against him on Johnson's murder as relatively strong compared with the evidence on the murders of Picard, Jennings, Brown, and Lang. We do not, however, accept defendant's characterization of the evidence; there was overwhelmingly strong

evidence against him on every count. The prosecution's evidence on Johnson's murder included defendant's own testimony that he used a choke hold on Johnson, the eyewitness testimony of defendant's accomplice, Johnson's blood on defendant's clothes, and defendant's blood underneath Johnson's fingernails. The prosecution's evidence on the other murders included defendant's unsolicited confession in the "Epitaph Tape," four subsequent confessions to police, and the physical evidence gathered at the crime scenes, which substantially corroborated defendant's statements. In view of this evidence, it cannot be said on any principled basis that the Johnson murder count was stronger than the others.

### 2. *The Picard Murder*

Defendant next contends that the trial court abused its discretion by denying his motion to sever the Picard murder charge and that its consolidation caused gross unfairness at trial.[5]

Defendant bases these arguments on the assumption that the strangulation/murder/robberies of the four elderly victims were not sufficiently similar to be cross-admissible on the issue of identity. However, whether or not the evidence was cross-admissible, defendant has not carried his burden of showing prejudice. As we have already observed, the absence of cross-admissibility does not by itself establish prejudice. (See *Frank* v. *Superior Court, supra,* 48 Cal.3d at p. 641.) Defendant also claims that consolidation caused prejudice because the Picard murder charge was relatively strong in comparison with the others. It is true that defendant, at the time of trial, no longer admitted involvement in the murders of Jennings, Brown, and Lang. However, defendant had confessed to each of the murders several times before trial. His 11th-hour attempt to repudiate these confessions did not make the evidence of his guilt so weak as to render consolidation an abuse of discretion.

### B. *Jury Selection*

### 1. *Prosecutor's Use of Peremptory Challenges*

■ Defendant argues that the court erroneously denied his motion under *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]. Defendant, who is White, contends that group bias against Blacks motivated the prosecutor's use of peremptory challenges to exclude some

---

[5] Defendant moved to sever the Picard murder charge on September 29, 1981, seven months before he killed Johnson and approximately a year before the trial court granted the People's motion to consolidate the ensuing murder charge.

prospective jurors from the panel. Assuming for the sake of argument that defendant made out a prima facie case of discrimination, it is clear from the record, as the trial court expressly found, that each of the prosecutor's challenges had an adequate legal basis other than group bias.

Defense counsel made two *Wheeler* motions. In his first, he argued that the prosecutor was using peremptory challenges to exclude persons of any race with reservations about capital punishment. Defendant does not renew this argument on appeal. We set out this incident only because it helps to explain the court's denial of defendant's second *Wheeler* motion based on alleged racial bias.

For the record, defense counsel named those prospective jurors whose answers, in his opinion, showed that they "were opposed to the death penalty." Included in this group were each of the Black prospective jurors whom the prosecutor had peremptorily challenged. Although the court correctly declined to hold that counsel had made out a prima facie case based upon exclusion of death penalty skeptics (*People* v. *Zimmerman* (1984) 36 Cal.3d 154, 160-161 [202 Cal.Rptr. 826, 680 P.2d 776]), the prosecutor nevertheless insisted on putting into the record his reasons for excluding such persons.

Defendant's second *Wheeler* motion raised a claim of exclusion based on racial bias. The trial court did not expressly rule that defense counsel had made out a prima facie case under *Wheeler*.[6] Indeed, the court expressed doubt whether the prosecutor could possibly have had a motive to exclude Black prospective jurors, since defendant and all of his victims were White and since there would be evidence that defendant was reputed to belong to the Aryan Brotherhood, a White racist prison gang. Defense counsel declined the court's invitation to explain, in view of these factors, how an absence of Black jurors might prejudice defendant. At that point the trial court simply turned to the prosecutor for a response.[7]

---

[6] The process of jury selection had increased the percentage representation of Black jurors. The panel of 160 prospective jurors included only 8 prospective Black jurors. The panel was, thus, 5 percent Black. The jury as sworn included one Black juror and one Black alternate. The petite jury was, thus, 8.3 percent Black not including alternates, and 14 percent Black including alternates.

[7] Thus, the trial court did not expressly rule that defendant had stated a prima facie case of group bias. We do not "approv[e] of rulings by implication on this important issue" (*People* v. *Turner* (1986) 42 Cal.3d 711, 719 fn. 3 [230 Cal.Rptr. 656, 726 P.2d 102]; see also *People* v. *Snow* (1987) 44 Cal.3d 216, 222 [242 Cal.Rptr. 477, 746 P.2d 452]), and we have in the past declined to interpret ambiguous records as containing implicit rulings. (*People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1901 [259 Cal.Rptr. 630, 774 P.2d 659].) Absent an express ruling, "prosecutors may be uncertain as to the necessity for justifying their use of peremptory challenges," with the result that the record will not be adequate to permit review. (*People* v. *Turner, supra,* 42 Cal.3d at p. 729 [conc. opn. by Panelli, J.].) In this case, however, the

Because the prosecutor had already articulated his reasons for excluding each of the Black prospective jurors and alternates, he asked the court to "incorporate [his] previous remarks." The prosecutor also emphasized what the court and both counsel had already acknowledged and discussed at length, i.e., that each of the challenged Black men and women had expressed a reluctance to impose the death penalty. For this reason, the court expressly found that the prosecutor had "acceptable, legal bases for [the prospective jurors'] exclusion, if, coincidentally, they happen[ed] to be Black." Because the record supports this finding, we reject defendant's challenge to the trial court's ruling.[8]

Nor does the record support defendant's argument that the prosecutor failed to articulate reasons for excluding prospective juror Valerie Jessie. The record shows that the prosecutor did mention Jessie and stated that he had challenged each of the Black prospective jurors who were excluded, including Jessie, because of opposition to the death penalty.

The record also contradicts defendant's argument that the trial court "did nothing to refresh its memory" of the protracted voir dire and, in particular, "did not consult [her] notes." The record shows that the judge did consult her notes on jury selection before hearing the *Wheeler* motion.

Finally, defendant argues that the trial court devoted insufficient attention to the prosecutor's explanation of his peremptory challenges. Defendant relies on *People* v. *Hall* (1983) 35 Cal.3d 161 [197 Cal.Rptr. 71, 672 P.2d 854], in which we stated that the court must make a "sincere and reasoned attempt to evaluate the prosecutor's explanation" in order to

prosecutor proceeded as if the court had found a prima facie case. Because the record is thus adequate to permit review, it does no harm under the particular facts of this case to assume, merely for the sake of argument, that defendant did make out a prima facie case.

[8] The record shows that each of the prospective jurors whom the prosecutor challenged gave answers that a reasonable person could fairly interpret as showing reluctance to impose the death penalty. Sharon Bankhead said that she absolutely did not believe in capital punishment. Jessie Carroll expressed religious objections to the death penalty and doubts about whether she would be able to impose it. Valerie Jessie agreed, with some hesitation, that she could impose the death penalty in a proper case, but she also said that she did not like capital punishment. Beverly Richardson thought that she would consider imposing the death penalty, but previously had been extremely opposed. Lela Sanders said that she would not impose the death penalty under any circumstances. Freddie Turner said that he did not believe in capital punishment.

As is often the case, some of these prospective jurors made conflicting statements. However, just as a trial judge must resolve conflicts in prospective jurors' answers in order to determine their eligibility for service under *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] and *Wainwright* v. *Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], an attorney faced with conflicting responses must logically base the decision whether to exercise a peremptory challenge on a prospective juror's entire voir dire examination.

"satisfy itself that the explanation is genuine." (*Id.*, at p. 167.) However, since the prosecutor explained that the prospective jurors' opposition to the death penalty was the primary basis for his peremptory challenges, and since defense counsel himself had argued that each of the excluded Black prospective jurors was opposed to the death penalty, there was no reason to doubt that the prosecutor's explanation was genuine.

Accordingly, assuming for the sake of argument that defense counsel made out a prima facie case of group bias, the prosecutor adequately demonstrated that each peremptory challenge of a Black prospective juror or alternate had a proper basis unrelated to group bias. Therefore, the trial court properly denied counsel's *Wheeler* motion.

### 2. *Limitation of Voir Dire*

Next, defendant argues that the trial court impermissibly restricted the scope of voir dire. The record, however, shows that the court properly confined its supervision of voir dire to the limits established in *People* v. *Williams* (1981) 29 Cal.3d 392 [174 Cal.Rptr. 317, 628 P.2d 869].

█ In *People* v. *Williams, supra,* we held that counsel "should be allowed to ask questions reasonably designed to assist in the intelligent exercise of peremptory challenges whether or not such questions are also likely to uncover grounds sufficient to sustain a challenge for cause." (*Id.*, at p. 407.) In so doing, however, we expressly "le[ft] intact the *considerable discretion* of the trial court to contain voir dire within reasonable limits." (*Id.*, at p. 408, italics added.) We also "reaffirm[ed] that it is not 'a function of the examination of prospective jurors to educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law.' " (*Ibid.*, quoting *Rousseau* v. *West Coast House Movers* (1967) 256 Cal.App.2d 878, 882 [64 Cal.Rptr. 655].)

On appeal defendant argues that the court "took the general view that [voir dire] questioning had to be limited to the nature of the charges as they were reflected upon the face of the information." Our review of the record, however, shows that the court made no such ruling. Instead, defendant's characterization of the court's "general view" is really just an objection to the court's refusal to permit a few, particular questions.

█ Defendant objects, in particular, to the court's denial of his counsel's request for permission to "summarize the facts of the prosecution's case" and to ask each juror based upon the summary whether he or she "would

automatically vote for death." To this end, counsel proposed a lengthy, factually detailed question that would have given prospective jurors substantial information about defendant's victims and the manner in which they were killed.[9]

The proposed question, as presented to the court, was almost certain to accomplish two of the evils against which we warned in *People* v. *Williams, supra*: "'educat[ing] the jury panel to the particular facts of the case [and] compel[ling] the jurors to commit themselves to vote a particular way. . . .'" (29 Cal.3d at p. 408.) Accordingly, the court properly exercised its discretion to disallow the proposed question. It is not a proper object of voir dire to obtain a juror's advisory opinion based upon a preview of the evidence. Many persons whose general neutrality toward capital punishment qualifies them to sit as jurors might, if presented with the gruesome details of a multiple-murder case, conclude that they would likely, if not automatically, vote for death.

■ Defendant also objects to the court's refusal to permit counsel to ask two prospective jurors whether, if they believed that a witness was an informant and was testifying "in exchange for some lesser sentence," then that "would have some bearing on the weight or credibility that that witness may have in your mind?" The prosecutor objected to the question on the correct ground that it "ask[ed] for a prejudgment," specifically of Maurice Grant's credibility,[10] and the court properly sustained the objection both times it was asked. (See *People* v. *Williams, supra*, 29 Cal.3d at p. 408.)

Finally, defendant challenges the court's refusal to permit two questions involving evidence that would be presented at the penalty phase. The questions would have solicited prospective jurors' attitudes about fund-

---

[9] Defense counsel proposed to ask each prospective juror to "assum[e] that he is on the jury and that he and the other [eleven] jurors have found Mr. Mason guilty of [five] counts of [first] degree murder with special circumstances, and then to describe the evidence that would have been presented to them, that is, [four] of the murder victims were elderly; one was 69, [two] in their 70's and one who was 83 years old; that each of the elderly victims lived alone in [his or her] house or apartment; that each of the elderly victims was beaten and then strangled to death; that each of the [four] elderly victims was robbed of a small amount of money or goods; that in the [fifth] case, the killing of Boyd Johnson, that Boyd Johnson was an inmate in the jail along with Mr. Mason and that Mr. Johnson was beaten and then strangled and then hung with a noose from a shower curtain rod. And then to ask [the prospective juror] . . . whether [the juror] would then automatically vote for death . . . ."

[10] The evidence showed that Grant had come to be known as an informant and that his life had been threatened. For that reason Grant's sentencing judge had modified his sentence, on the prosecutor's motion, to permit him to serve a shorter term in county jail where he might be safer. While it certainly was proper for defense counsel to argue in closing, as he did, the inference that Grant's sentence reduction was a reward for his testimony against defendant, to do so at voir dire under the guise of asking a hypothetical question posed an unacceptable risk of prejudicing the jury.

amentalist churches and about defendant's strict upbringing. Since the jury that tried the guilt phase did not reach a verdict on penalty, the refusal to permit such questions, even if erroneous, cannot have been prejudicial.

### C. *Evidentiary Rulings*

#### 1. *Admission of Evidence of Flight*

The trial court admitted, to show consciousness of guilt, evidence of the high-speed automobile chase involving defendant and two Alameda County sheriff's deputies. Defendant argues that the court should have exercised its discretion to exclude the evidence under Evidence Code section 352 because the risk of undue prejudice outweighed probative value. Defendant also argues that the court should not have instructed the jury on flight pursuant to section 1127c. We reject both arguments.

Defendant's flight took place on January 6, 1981, only four weeks after, and in the same jurisdiction as, the murder of Dorothy Lang. ■ Defendant argues that his flight was so remote from the charged offenses that it "was of marginal probative value, if any." Common sense, however, suggests that a guilty person does not lose the desire to avoid apprehension for offenses as grave as multiple murders after only a few weeks. Nor do our decisions create inflexible rules about the required proximity between crime and flight. Instead, the facts of each case determine whether it is reasonable to infer that flight shows consciousness of guilt. In *People* v. *Santo* (1954) 43 Cal.2d 319 [273 P.2d 249], for example, we held that the trial court properly admitted evidence of flight occurring more than a month after the charged murder because the facts fairly supported that inference.[11] (43 Cal.2d at pp. 327-330.)

---

[11] In *People* v. *Santo, supra*, a death penalty case, evidence of flight connected the defendants with the commission of the offense and, thus, corroborated an accomplice's testimony. (*Id.*, 43 Cal.2d at p. 327.)

To argue that his flight had little probative value, defendant relies on *People* v. *Newton* (1966) 244 Cal.App.2d 82 [52 Cal.Rptr. 727]. In that case, the court held that "[i]n order for flight to have evidentiary force, it must take place under circumstances such that it appears that *defendant knew that he was charged with the crime involved* . . . ." (*Id.*, at p. 85, italics added.) Because there was no evidence in that case that the defendants knew they had been charged with the offense for which they were on trial, the court held that it was erroneous to admit evidence of their flight. (*Ibid.*) Defendant employs the same reasoning to argue that the court should not have admitted evidence of his flight. According to defendant, he "knew he was the only possible suspect in the murder of Robert Groff," but "he had no reason to think that he was being sought for any of [the other] four killings."

While the rule applied in *People* v. *Newton, supra*, was good law at the time (see *People* v. *Jones* (1911) 160 Cal. 358, 369 [117 P. 176]), we have long since rejected it. In *People* v. *Hill* (1967) 67 Cal.2d 105 [60 Cal.Rptr. 234, 429 P.2d 586], we explained that "[t]he Legislature's purpose in enacting [Penal Code] section 1127c [in 1929] was to abolish the rule stated in

■ Based on the assumption that his flight was of marginal probative value—an assumption that we do not necessarily accept—defendant makes the further argument that admission of the evidence was unduly prejudicial because it forced him to admit uncharged crimes to explain the flight. However, the existence of other crimes which may explain the defendant's flight goes to the weight, not to the admissibility, of evidence. In *People* v. *Santo, supra,* 43 Cal.2d 319, the defendants argued that their flight indicated consciousness of guilt of two uncharged crimes. We held that, while "[i]t is true that the evidence [of flight] does not specifically and directly evidence consciousness of guilt of the killing . . . any more than it evidences consciousness of guilt of [the uncharged offenses]," nevertheless "[i]t was for the jury to determine the weight, if any, against defendants of such evidence." (*Id.,* at p. 330; see also *People* v. *Perry* (1972) 7 Cal.3d 756, 772-774 [103 Cal.Rptr. 161, 499 P.2d 129].)

The uncharged offenses that defendant recounted in order to explain his flight, and which he now claims were highly prejudicial, were no less remote than the murder of Dorothy Lang. The uncharged murder of Robert Groff was committed two weeks *before* the murder of Lang, in a different jurisdiction and more than a hundred miles from the place where defendant had fled from the Alameda County sheriff's deputies. The armed robbery of John Vasko, which did take place in Alameda County, occurred on December 10, 1980, only four days after the murder of Dorothy Lang.[12]

On these facts, the inference that defendant fled to avoid apprehension for the murders of Picard, Jennings, Brown, and Lang is at least as strong as the inference that he fled to avoid apprehension for the murder of Groff and the armed robbery of Vasko. (Cf. *People* v. *Santo, supra,* 43 Cal.2d at p. 330.) Therefore, it was within the trial court's discretion to conclude that any danger of undue prejudice associated with the evidence of flight did not outweigh the evidence's probative value. (See Evid. Code, § 352.)

■ Defendant next claims that it was error to instruct the jury on flight. Citing *People* v. *Anjell* (1979) 100 Cal.App.3d 189 [160 Cal.Rptr. 669], defendant argues that such an instruction is erroneous whenever "identity is

many early cases that the jury could not be instructed to consider flight as evidence of guilt unless it had been proved that the fleeing suspect had previously learned that he was accused of the commission of a particular crime." (*People* v. *Hill, supra,* 67 Cal.2d at pp. 120-121; see also *People* v. *Olea* (1971) 15 Cal.App.3d 508, 515 [93 Cal.Rptr. 265].) Accordingly, defendant's asserted lack of knowledge about the status of police investigations had no bearing on the court's decision to admit evidence of his flight.

[12] Defendant also claimed that he fled because he was armed and carrying drugs for Stephen Denard. Defense counsel, however, had mentioned only the Groff killing and the Vasco robbery during the motion to exclude evidence of flight. The trial court cannot be faulted for not considering defense theories that the defense chose not to disclose until later.

a contested issue." (*Id.*, at p. 199.) While defendant admitted involvement in the Picard murder, he presented alibis for the murders of Jennings, Brown, and Lang. We reject the argument. The court that decided *People v. Anjell*, *supra*, has since retreated from the overly broad dictum on which defendant relies, holding that the case "does not stand for such a sweeping proposition." (*People v. Rhodes* (1989) 209 Cal.App.3d 1471, 1475 [258 Cal.Rptr. 71].) Elsewhere, *Anjell*'s broad dictum has been widely rejected. (E.g., *People v. Batey* (1989) 213 Cal.App.3d 582, 585-588 [261 Cal.Rptr. 674]; *People v. Simon* (1989) 208 Cal.App.3d 841, 850-851 [256 Cal.Rptr. 373]; *People v. London* (1988) 206 Cal.App.3d 896, 902-906 [254 Cal.Rptr. 59]; *People v. Cowger* (1988) 202 Cal.App.3d 1066, 1076-1077 [249 Cal.Rptr. 240].)

If there is evidence identifying the person who fled as the defendant, and if such evidence "is relied upon as tending to show guilt," then it is proper to instruct on flight. (§ 1127c.) "The jury must know that it is entitled to infer consciousness of guilt from flight and that flight, alone, is not sufficient to establish guilt. ([] § 1127c.) The jury's need to know these things does not change just because identity is also an issue. Instead, such a case [only] requires the jury to proceed logically by deciding first whether the [person who fled] was the defendant and then, if the answer is affirmative, how much weight to accord to flight in resolving the other issues bearing on guilt. The jury needs the instruction for the second step." (*People v. London, supra,* 206 Cal.App.3d at p. 903.)[13]

In this case, there was evidence that defendant fled from Alameda County sheriff's deputies. Moreover, as we have already discussed, defendant's flight rationally supported an inference that he was conscious of guilt. For these reasons, it was proper to instruct on flight.

### 2. *Admission of Knotted Cords*

 The trial court admitted into evidence four lengths of cotton cord found in defendant's hotel room at the time of his arrest. A half-hitch, or loop, was tied into the end of each cord. Counsel objected on relevance grounds, without elaboration. The court explained that it was admitting the evidence because it was "clear . . . that it deal[t] with strangulation, premeditation."

The record shows that the cords were relevant to corroborate defendant's confession, which he recanted at trial. Defendant told the police that he had

---

[13] We disapprove *People v. Anjell, supra,* 100 Cal.App.3d 189, and its progeny to the extent such cases are inconsistent with the views expressed herein.

strangled Antoinette Brown with a piece of "rope type cord" made of cotton. Asked where he had obtained the cord, defendant answered: "I just, uh, picked it up somewhere. Had it in my pocket. When I was, I was sittin' down somewhere and, uh, was making different knots and bow knots and half hitches and different knots. Hangman's noose. I just had it in my pocket." Brown was found at the murder scene with lingerie tied around her neck. The coroner, however, testified that it was possible another ligature had been applied first. Defendant's possession of cotton cords knotted with half-hitches obviously tended to corroborate his confession. Since defendant repudiated his confession at trial, it was appropriate for the prosecutor to introduce corroborating evidence.

On appeal, defendant argues that the cords were improperly admitted to show "intent to strangle" and that they permitted the prosecutor to portray defendant to the jury as "a remorseless killer ready to strangle anyone on a moment's notice, having already prepared the weapons." Nothing in the record supports this argument, however, other than the court's cryptic reference to "premeditation" in ruling the evidence admissible. The prosecutor made no use of the cords whatever during closing argument at the guilt phase.[14] Since the evidence was admissible to corroborate defendant's confession, it is irrelevant that the trial court might have had a different theory of admissibility in mind. It is axiomatic that we review the trial court's rulings and not its reasoning. (See, e.g., *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 18-19 [112 Cal.Rptr. 786, 520 P.2d 10]; *Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].)

### 3. *Admission of Photographs*

■ Defendant argues that the trial court should have exercised its discretion under Evidence Code section 352 to exclude photographs of the bodies of Picard, Brown, and Lang, and of the related crime scenes. We find no abuse of discretion.

"Admission of photographs of the victims is within the sound discretion of the trial court, and that discretion will not be disturbed unless it is manifest that the probative value of the evidence is outweighed by its prejudicial effect." (*People* v. *Bean, supra,* 46 Cal.3d at p. 943.) In this case, as in *People* v. *Bean, supra,* the trial court individually considered each of the

---

[14]The prosecutor mentioned the cords only once during closing argument in the penalty phase. Celia Keener, a penalty phase witness, had testified that the cords were similar to those defendant had used to tie her while robbing the Design Emporium. After referring to Keener's testimony, the prosecutor reminded the jury, without any elaboration, that such cords had been found in defendant's hotel room.

many photographs offered by the prosecution and exercised its discretion to admit only a fraction.

The 29 photographs that defendant challenges on appeal had significant probative value. Because defendant had repudiated his earlier confessions, such photographs were necessary to corroborate his earlier, detailed statements about the way in which the victims had died and what acts had been committed in the victims' dwellings. For this reason it was within the trial court's discretion to admit the photographs even though they were admittedly unpleasant. Our own review of the photographs confirms that the court did not abuse its discretion.

### D. *Alleged Instances of Prosecutorial Misconduct*

#### 1. *Examination of Maurice Grant*

In his direct examination of Maurice Grant, a former prisoner who witnessed the murder of Boyd Johnson, the prosecutor elicited the testimony that Grant was transferred to the county jail with a reduced sentence after becoming known as an informant and receiving threats against his life. Defendant argues that the prosecutor committed misconduct by eliciting this testimony. However, the record does not support defendant's claim.

Grant testified at defendant's preliminary hearing while he was an inmate at the Contra Costa County jail. Before he testified, Grant began to receive written death threats. He discussed the threats with jail officials, who placed them in his official record. Because Grant feared that his life would be in danger at state prison, the prosecutor made a motion before the judge who had sentenced Grant to have his sentence modified from a term in state prison to a shorter term in county jail.

Anticipating that defense counsel would impeach Grant with the favorable sentence modification, the prosecutor raised the subject on direct examination. The prosecutor asked Grant, "Did you receive any threats as the result of your having testified against David Mason at the preliminary examination?" Grant answered, "Yes. I did." Explaining how the threats had been communicated, Grant testified, "Well, I got the first one, they wrote a letter, you know, but I just kind of shined it off. But then more kept on coming. Then I got one that says that if I didn't get off of this macho by the 9th——." At this point, defense counsel interrupted Grant's testimony with an objection.

In chambers, defense counsel argued that Grant's testimony about the sentence modification and the threats that prompted it were not relevant on

direct examination, and that those matters should come before the jury, if at all, when the defense chose to impeach Grant. The prosecutor moved to strike Grant's testimony about the sentence modification in order to remove a "complicating factor." Defense counsel did not take a position. The trial court denied the motion to strike, reasoning that it was "far fairer to [defendant] to not try to unring that bell . . . ."[15]

When the direct examination continued, Grant answered five times, unambiguously, that defendant was "totally unconnected" to the death threats; they had not come from him or on his behalf.[16] Instead, Grant had been given a "snitch jacket," i.e., acquired a reputation as an informer, and the threats pertained "generally to that snitch jacket . . . ."

On appeal, defendant argues that it was improper for the prosecutor to ask questions about threats because Grant's responses permitted the jury to infer that defendant had "threatened a testifying witness" or "was conspiring to threaten witnesses." Defendant relies primarily on *People* v. *Weiss* (1958) 50 Cal.2d 535 [327 P.2d 527], in which we stated that evidence of an anonymous threat not connected with the defendant "should at once be suspect as . . . an endeavor to prejudice the defendant before the jury in a way which he cannot possibly rebut satisfactorily because he does not know the true identity of the pretender." (*Id.*, at p. 554.)

---

[15] In chambers, the trial court denied counsel's motion for a mistrial on the ground that the prosecutor had allegedly violated discovery obligations. (See, e.g., *Brady* v. *Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215, 83 S.Ct. 1194].) While counsel had been informed about the modification of Grant's sentence, he claimed not to have received copies of the written death threats. The trial court properly denied the motion for a mistrial because the written threats had been equally available to defense counsel in Grant's jail records and because they had not been in the prosecutor's file.

The court also denied counsel's motion for a continuance, and for a mistrial based upon the denial of a continuance. The court did, however, offer to permit counsel to recall Grant for further cross-examination after the upcoming weekend break. On appeal, defendant does not renew the contention that the court erred by denying a continuance.

[16] We quote a few of the prosecutor's questions, with Grant's responses:

"Q. But again, to be very, very clear here so that the ladies and gentlemen have no misunderstanding at all, *the threats that I referred to pertain generally to that snitch jacket and in no way came from Mr. Mason or anyone at his direction*; in other words, Mr. Mason is not the man who threatened you nor anybody at his direction; *he was totally unconnected in all ways* from the threats that you may have received. That's correct, is it not?

"A. That's correct.

". . . . . . . . . . . . . . . . . . . . .

"Q. All right. *So you're in no way either saying or implying that Mr. Mason had any connection whatsoever, direct or indirect, with any threats or any bad feelings toward you by other inmates*; that is correct, is it not?

"A. That's very true." (Italics added.)

In his brief, defendant argues that the jury "must have inferred" that the threats came on defendant's behalf from the Aryan Brotherhood. However, nothing in Grant's testimony about the threats even remotely supports this appellate-level speculation.

Assuming for the sake of argument that the prosecutor should not have raised the subject of threats on direct examination, the record in this case does not support defendant's claim of prejudice. Grant expressly testified that defendant was not connected with the threats in any way. Thus, the claim of prejudice here is much weaker than in *People v. Weiss, supra,* where it was also rejected. (50 Cal.2d at p. 554.) In that case, a witness's vague testimony had left open the possibility that one of the defendants was connected with an anonymous threat received over the telephone. The court and the prosecutor made weak attempts to dispel the prejudicial inference by informing the jury that there was no reason to believe that *"defense counsel"* had been responsible for the threat. (*Id.,* at p. 553, italics added.) The inference persisted, however, that the defendant, himself, had been responsible for the threat. (*Ibid.*)

In contrast, the prosecutor in the case before us made diligent efforts to ensure that no prejudicial inference arose. This circumstance strongly distinguishes this case from *People v. Weiss, supra,* and the other cases on which defendant relies.[17] In response to the prosecutor's questions, Grant testified five times, unambiguously, that defendant was not connected with the threats in any way, directly or indirectly. After this testimony it is unlikely in the extreme that the jury understood the threats as anything other than an explanation of why Grant's sentence had been modified. Thus, it is not reasonably probable that, but for Grant's testimony about the threats, the verdict would have been more favorable to defendant. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### 2. *Examination of Defendant*

The next claim of misconduct relates to the People's cross-examination of defendant, in which the prosecutor referred to defendant's successful motion *in limine* to exclude evidence of the two firearms that arresting officers had found in his hotel room. Assuming for the purpose of the discussion that it was not proper for the prosecutor to elicit the information that it was defendant who had moved to exclude the weapons, it is nevertheless clear that no prejudice ensued.

The court had originally excluded the evidence *in limine,* rejecting the prosecutor's theory that the guns showed defendant's desire to avoid

---

[17] In *People v. Hannon* (1977) 19 Cal.3d 588, 596-599 [138 Cal.Rptr. 885, 564 P.2d 1203], the prosecutor requested a jury instruction on consciousness of guilt based upon an unsupported inference that defendant had attempted to suppress testimony. (*Id.,* at pp. 596-602.) Similarly, in *Dudley v. Duckworth* (7th Cir. 1988) 854 F.2d 967, the record suggested the "strong possibility that the prosecutor intended to get the threat testimony before the jury under a pretext." (*Id.,* at p. 971.)

apprehension and, thus, consciousness of guilt. Despite this favorable ruling, however, defendant himself testified about the guns and raised other issues to which the guns were relevant. To explain his flight from the Alameda County sheriff's deputies, defendant testified about the murder of Robert Groff and several robberies. Defendant also testified that he had used the same .25-caliber pistol to kill Groff and had carried the same sawed-off shotgun in the robbery of the Design Emporium. Following this testimony the court admitted the guns into evidence without objection. Later, defendant testified that the guns had been in his possession at the time he was arrested. It was at that point that the prosecutor asked defendant whether his counsel had moved to exclude the guns.[18] The trial court denied defense counsel's motion for a mistrial.

Because of the ruling *in limine*, the officer had not mentioned that the guns were among the items found in defendant's hotel room. To avoid unjustified doubts about the officer's credibility following defendant's testimony, the People were entitled to have the apparent discrepancy and the ruling *in limine* explained to the jury in some appropriate fashion. To accomplish that purpose it may not have been necessary to elicit the information that the motion had been made by the defense. However, even assuming the question's impropriety, there is no reason to believe that it resulted in prejudice. Defendant argues that the question "impl[ied] that he [was] trying to keep the truth from the jury," but the prosecutor made no such argument. Nor is it likely that the jurors drew such an inference since it was defendant, himself, who had first mentioned the guns. Accordingly, we do not find it reasonably probable that a trial without the question would have resulted in an outcome more favorable to defendant. (*People* v. *Watson, supra,* 46 Cal.2d at p. 836.)

### 3. *Examination of Deputy Silva*

■■■ On redirect examination the prosecutor elicited testimony from Deputy Silva to the effect that defendant, before killing Johnson, had behaved violently toward other inmates. Defendant, who unsuccessfully

---

[18] We quote the relevant exchange:

"Q. [By the prosecutor.] You through your lawyer made a motion during this trial out of the presence of the jury to exclude the use of these weapons, this sawed off shotgun, which was in that room, and that .25 caliber automatic, which was in that room when you were arrested; do you recall that motion?

"A. [By defendant.] I never made such a motion.

"Q. Well, your lawyer did in your behalf, didn't he?

"A. He may have.

"Q. In any event, when the ladies and gentlemen heard the testimony from the sheriff, they didn't hear anything about the sawed off shotgun or the pistol, did they?

"A. No . . . ."

moved for a mistrial, argues that the question was misconduct. The People argue that the question was necessary to explain Silva's earlier testimony. We need not, however, resolve the claim of misconduct because it is clear that no prejudice ensued.

Silva, an Alameda County sheriff's deputy, was on duty in the county jail on the night when Johnson arrived and was murdered. Called by the defense, Silva testified about the night's events. Defense counsel's examination was apparently intended to show that prisoners other than defendant had a motive to kill Johnson. In response to counsel's questions, Silva testified that Johnson became obscene and abusive when he learned that he would be housed with other prisoners rather than in protective custody. Silva also testified that Johnson carried a police detective's business card into the jail despite Silva's warning that to do so might endanger him.

Defense counsel's examination stopped with these points, but the People wished to use Silva's testimony to implicate defendant as the killer. Because the prosecutor's offer of proof went beyond the subjects already addressed, the court made Silva the People's witness. On direct examination by the prosecutor, Silva testified that he had advised defendant to watch the evening news. After the broadcast, Silva called the telephone in F Tank. When Shorter answered, Silva asked to speak to defendant. Defendant informed Silva that there might be a "third-degree session" involving Johnson. Silva responded that he did not want trouble on his shift.

On cross-examination by the defense, Silva testified that he had asked to speak with defendant because he "was concerned about [defendant's] behavior toward Johnson more than Shorter." On redirect, the prosecutor asked Silva why he was more concerned with defendant's behavior than Shorter's, and whether his "thinking process" "involve[d] . . . knowledge of prior acts of violence of [defendant] toward other inmates in the jail setting?" Silva answered, "Yes."

Silva's answer obviously suggested to the jury that defendant had behaved violently toward other prisoners. However, assuming that it was misconduct to have elicited such testimony, it is not reasonably probable that a trial without it would have resulted in a verdict more favorable to defendant. (*People* v. *Watson, supra,* 46 Cal.2d at p. 836; *People* v. *Bolton* (1979) 23 Cal.3d 208, 213-214 [152 Cal.Rptr. 141, 589 P.2d 396].)

Evidence of "other crimes" carries a risk of prejudice for two reasons. First, such evidence can tempt a jury to identify a defendant as the wrongdoer illogically, simply because he has committed prior, similar crimes. Second, such evidence can tempt a jury to convict in order to punish

a defendant for the uncharged offenses. In this case, however, it is not likely that the vague allusion to prior acts had either effect. It is unlikely in the extreme that the jury used character evidence to identify defendant as the killer, since defendant admitted that he had participated in Johnson's killing and since eyewitnesses identified him as the actual killer. It is just as unlikely that the jury found defendant guilty of Johnson's murder in order to punish him for the unspecified acts of violence. In view of the four other murders with which defendant was charged, the one vague reference to prior acts cannot have assumed any appreciable significance in the jury's deliberations.

## E. Instruction on the Groff Killing

 Defendant claims that a jury instruction on the potential legal significance of the killing of Robert Groff was erroneous and undermined defendant's credibility. We reject the claim because the instruction merely pointed out, in a neutral fashion, an unresolved question of law.

As already mentioned, defendant explained his flight from Alameda County sheriff's deputies by admitting that he had killed Robert Groff. Defense counsel argued that this admission enhanced defendant's credibility in denying the charged homicides, particularly because the Groff killing was potentially a capital offense. At the time of the trial in this case, the pending complaint in the Groff case did not yet allege a previous conviction of murder as a special circumstance. (See § 190.2, subd. (a)(2).)

On cross-examination, the prosecutor attempted to undermine the defense by questioning defendant's belief that the Groff killing was potentially a capital crime. To this end, the prosecutor asked defendant whether he was not attempting to "cut [his] losses" by admitting to a noncapital offense to bolster his credibility and thereby obtain acquittal on four capital offenses. In response, defendant testified to his understanding that the Butte County complaint could still be amended to allege a special circumstance.

At the time of trial, California courts had not yet decided whether a prior conviction of murder, to constitute a special circumstance, had to precede the subsequent murder or only the subsequent murder conviction. It was not until several years after the trial in this case that we decided "[t]he order of the commission of the homicides is immaterial" and that a person already convicted of murder in a prior proceeding "must be considered eligible for the death penalty if convicted of first degree murder in a subsequent trial." (*People* v. *Hendricks* (1987) 43 Cal.3d 584, 596 [238 Cal.Rptr. 66, 737 P.2d 1350].) In view of the uncertainty in the law, the trial court instructed the jury that "what is the precise meaning of this statutory law

has never been passed upon by any court. The two different interpretations used by [the prosecutor] on one hand and by [defense counsel] on the other hand both reflect good, sound, legal analysis. Which interpretation is correct, is yet to be decided by the courts."

On appeal, defendant argues that the court had a duty to decide this question of law and that the better view at the time, which we eventually adopted, was that homicides could be committed in any order and still be charged as special circumstances under section 190.2, subdivision (a)(2). Defendant bases his argument on an appellate court decision (*People* v. *Superior Court (Brodie)* (1975) 48 Cal.App.3d 195, 201 [121 Cal.Rptr. 732]) interpreting the predecessor of section 190.2 in the way that we eventually interpreted the current statute.

The trial court, however, had no occasion to decide the hypothetical question whether the Butte County complaint might properly be amended at some future time to allege a prior conviction of murder. What was relevant to the jury's deliberation was not how the courts might eventually interpret the statute, but how defendant understood the risks of confessing under oath to Groff's murder. Indeed, this is precisely what both sides told the jury. Defense counsel argued that "[w]hat's really important here . . . is what was David Mason's interpretation when he was testifying on that witness stand." The prosecutor argued, to the same effect, that "[t]he whole purpose of delving into this subject was to determine [defendant's] understanding and from his understanding his motivation to tell you certain things." As the trial court's instruction merely permitted these arguments without unnecessarily taking sides, we find no error.

### F. *Instructions on Intent to Kill*

Defendant argues that the jury instructions on aiding and abetting did not comply with *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368]. In that case, the United State Supreme Court held that the Eighth Amendment forbids the imposition of the death penalty on one "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (*Id.*, at p. 797 [73 L.Ed.2d at p. 1151]; see also *Cabana* v. *Bullock* (1986) 474 U.S. 376, 385 [88 L.Ed.2d 704, 715-716, 106 S.Ct. 689]; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306].)

Based on defendant's testimony that he had participated in Picard's robbery and burglary but not her killing, the court instructed the jury on the law of aiding and abetting. Defendant argues that the instructions did not

sufficiently inform the jury that an aider and abettor, to be eligible for the death penalty, must have "intend[ed] that a killing take place." (*Enmund* v. *Florida, supra,* 458 U.S. at p. 797 [73 L.Ed.2d at p. 1151].)

The People and defendant presented dramatically different theories of Picard's murder. The People, relying upon defendant's detailed statements to the police, sought to prove that he had acted alone. Defendant, repudiating his earlier statements, testified that he had burglarized Picard's home with an accomplice, Doug Denard, and that Denard had killed Picard while defendant was in another room. Having heard both sides, the jury found defendant guilty of Picard's murder and also returned the special finding that he had personally and intentionally inflicted great bodily injury upon her. The special finding, which necessarily implies a total rejection of defendant's theory of the case, demonstrates beyond a reasonable doubt that the jury found defendant to be the actual killer. This satisfies the Eighth Amendment. (*Enmund* v. *Florida, supra,* 458 U.S. at p. 797 [73 L.Ed.2d at pp. 1151-1152]; *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

Accordingly, it is of no importance that the instructions on aiding and abetting could in theory have been construed not to require a finding that defendant actually killed, attempted to kill, or intended to kill. As the United States Supreme Court explained in *Cabana* v. *Bullock, supra,* 474 U.S. at page 391, footnote 6 [88 L.Ed.2d at page 720], "[t]here may be some cases in which the jury instructions would theoretically have permitted the jury to find the defendant guilty of a capital offense and sentence him to death without finding the *Enmund* factors, but in which the theory on which the case was tried and the evidence received leave no doubt that the jury's verdict rested on a finding that the defendant killed or intended to kill."

Consistently with this reasoning, we have affirmed judgments despite analogous claims of instructional error when the jury has specially found that the defendant personally used a firearm, and when such a finding has necessarily implied that the jury believed the defendant was the actual killer. (*People* v. *Adcox* (1988) 47 Cal.3d 207, 243-244 [253 Cal.Rptr. 55, 763 P.2d 906]; *People* v. *Silva* (1988) 45 Cal.3d 604, 626 [247 Cal.Rptr. 573, 754 P.2d 1070].) Since the special finding in this case demonstrates that the jury must have rejected defendant's explanation of the Picard murder, any instructional error on this point was harmless beyond a reasonable doubt. (*Chapman* v. *California, supra,* 386 U.S. 18.)

G. *Redundant Multiple-murder Special Circumstances*

The jury in this case found five separate allegations of multiple murder. (§ 190.2, subd. (a)(3).) ■■■ While it was technically incorrect to submit

redundant special circumstances to the jury (*People* v. *Williams* (1988) 44 Cal.3d 883, 927 [245 Cal.Rptr. 336, 751 P.2d 395]), "[a]ny error in charging more than one multiple-murder special circumstance is harmless at the guilt phase . . . ." (*Ibid.*) The remedy is to set aside the redundant findings.

### H. *Cumulative Error at the Guilt Phase*

Defendant contends that errors at the guilt phase, in cumulation, prejudicially affected the outcome of the trial. We disagree. We have identified a possibility of error only in three instances (see *ante*, pt. III.D.), and, as already discussed, it is clear by any standard that those did not affect the outcome of the trial. (*People* v. *Watson*, *supra*, 46 Cal.2d 818; *Chapman* v. *California*, *supra*, 386 U.S. 18.)

### IV. PENALTY PHASE ISSUES

### A. *Witt/Witherspoon Contentions*

Defendant argues that the court erroneously denied his motions to exclude three prospective jurors on account of their views about capital punishment. According to defendant, Juror Sandra Briggs and prospective jurors Joyce Toste and Anna Probst gave responses during voir dire which indicated bias in favor of the death penalty. The court denied defense motions to exclude each for cause. Defendant peremptorily excused Toste and Probst. Of the three, only Briggs sat on the jury.

 We find no error in the court's refusal to excuse Juror Briggs. Her voir dire does not indicate that she had views on capital punishment which would have prevented or substantially impaired the performance of her duties. (See *Wainwright* v. *Witt*, *supra*, 469 U.S. at p. 424 [83 L.Ed.2d at pp. 851-852], quoting from *Adams* v. *Texas* (1980) 448 U.S. 38, 45 [65 L.Ed.2d 581, 589-590, 100 S.Ct. 2521]; cf. *Witherspoon* v. *Illinois*, *supra*, 391 U.S. 510.)

Defendant bases his challenge to Briggs on an apparent conflict in her responses. When asked by defense counsel early in her voir dire whether she would "always vote for capital punishment" in the case of a defendant who was convicted of murdering another inmate while in jail, Briggs answered, "Yes, I think so." However, Briggs later retreated from that tentative answer. After the court and counsel explained a juror's obligation to hear and consider mitigating evidence, Briggs answered that such evidence, even in a case of murder committed in jail, could persuade her to vote against the death penalty. On this point, Briggs specifically answered that she "would try to leave [her] mind open and listen to everything" and that she could

"really" and "realistically" see herself voting for life imprisonment without the possibility of parole.

Based on Briggs's entire voir dire, the court expressly found that she would not "foreclose" consideration of mitigating evidence and that a vote by her against the death penalty was "still a realistic, practical possibility." The trial court's determination of Briggs's state of mind based upon her conflicting responses binds us as a reviewing court. (*People v. Coleman* (1988) 46 Cal.3d 749, 767 [251 Cal.Rptr. 83, 759 P.2d 1260]; *People v. Ghent* (1987) 43 Cal.3d 739, 768 [239 Cal.Rptr. 82, 739 P.2d 1250]; *People v. Fields* (1983) 35 Cal.3d 329, 356 [197 Cal.Rptr. 803, 673 P.2d 680]; *People v. Floyd* (1970) 1 Cal.3d 694, 725 [83 Cal.Rptr. 608, 464 P.2d 64]; *People v. Linden* (1959) 52 Cal.2d 1, 22 [338 P.2d 397].) Moreover, although the trial took place before *Wainwright v. Witt, supra*, the court's finding that a vote against the death penalty was "a realistic, practical possibility" clearly satisfies the standard articulated in that opinion. Accordingly, we find no error in the court's denial of defendant's motion to excuse Briggs for cause.

Because defendant peremptorily challenged prospective jurors Toste and Probst, he has no claim with respect to them under *Witherspoon* or *Witt*. The Sixth Amendment entitles a defendant to an impartial jury. (*Wainwright v. Witt, supra*, 469 U.S. at p. 423 [83 L.Ed.2d at p. 851].) Interpreting the Sixth Amendment, the Supreme Court has held that it is error *to include in the jury* someone whose views on capital punishment would "'prevent or substantially impair the performance of his duties.'" (*Wainwright v. Witt, supra*, 469 U.S. at p. 424 [83 L.Ed.2d at p. 851], italics added, quoting from *Adams v. Texas, supra*, 448 U.S. at p. 45 [65 L.Ed.2d at p. 589].) The remedy for erroneous inclusion is reversal. By definition, however, a person who is excluded from the jury has no effect on the jury's impartiality. Because defendant excluded Toste and Probst from the jury, any claim of erroneous inclusion under the Sixth Amendment is moot. (*Ross v. Oklahoma* (1988) 487 U.S. 81, 87-89 [101 L.Ed.2d 80, 89-91, 108 S.Ct. 2273].)

### B. *Admission of Defendant's Attempts to Escape and Possession of Weapons in Jail*

██ The trial court admitted evidence that defendant, while in administrative segregation at the county jail, attempted to escape twice and possessed weapons three times. The court admitted this evidence under section 190.3, factor (b), as "criminal activity . . . which involved the . . . implied threat to use force or violence." We hold that admission of this evidence was proper.

Defendant twice attempted to escape while awaiting retrial of the penalty phase. In his first attempt, defendant managed to saw loose on two sides the metal screen that covered the window to his cell. The damage was discovered in a search which took place after sheriff's deputies saw an inmate trustee talking with defendant through the porthole in his cell door. In the same search, deputies found a jeweler's carborundum saw with homemade handles in a nearby laundry room. The screen was replaced. A month later, deputies discovered that defendant had managed to make a new, three- by three-inch cut in the screen. The court introduced this evidence on the theory that an escape through the window would have involved defendant in a confrontation with a guard and, thus, entailed an "implied threat to use force or violence." (§ 190.3, factor (b).)

It is true, as defendant points out, that we have held the crime of escape *considered in the abstract* does not involve an inherent danger to life. "The fact that [violent] reactions do occur in some cases is not sufficient to support the conclusion that one who escapes from legal confinement thereby creates a situation inherently dangerous to human life." (*People v. Lopez* (1971) 6 Cal.3d 45, 52 [98 Cal.Rptr. 44, 489 P.2d 1372].) Based on this reasoning, we determined in *Lopez* that the crime of escape would not support application of the second degree felony-murder rule.

The reasoning of *Lopez*, however, is not applicable to determinations under section 190.3, factor (b). Whether a felony is inherently dangerous for purposes of the second degree felony-murder rule is determined by viewing the elements of the felony in the abstract. (*People v. Williams* (1965) 63 Cal.2d 452, 458 fn. 5 [47 Cal.Rptr. 7, 406 P.2d 647]; see also *People v. Patterson* (1989) 49 Cal.3d 615, 620-621 [262 Cal.Rptr. 195, 778 P.2d 549].) In contrast, whether a particular instance of criminal activity "involved . . . the express or implied threat to use force or violence" (§ 190.3, factor (b)) can only be determined by looking to the facts of the particular case.

Our decisions illustrate this. In *People v. Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782], the evidence showed only that the defendant had removed a grating from an air vent. (*Id.*, at p. 776.) On those limited facts, we held that the attempted escape could not be said to have involved an implied threat to use force. (*Id.*, at p. 777.) In contrast, the defendant's escape plan in *People v. Boyde* (1988) 46 Cal.3d 212 [250 Cal.Rptr. 83, 758 P.2d 25] called for the use of a gun to subdue the guard, if necessary. On those facts we held that the attempt to escape did involve an implied threat to use force. (*Id.*, at p. 250.)

Testimony in this case showed that an escape from the administrative segregation cell would almost certainly have involved defendant in a

confrontation with a guard. Not conceding the point, defense counsel proposed a hypothetical escape plan designed to show that defendant might have been able to escape without force. The plan involved cutting through three walls of bars and several windows and then rappelling over one hundred feet down the side of the building on a rope of bedsheets. However, to carry out such a time-consuming plan without encountering a guard was, according to uncontradicted testimony, impossible. Thus, the evidence adequately supports the trial court's ruling.

■ Even if the admission of defendant's escape attempts were assumed to be error, the error would be harmless. Arguing to the contrary, defendant asserts that the escape attempts "lent force to the prosecutor's theme that defendant, unless executed, would kill again . . . ." If such an inference arose, however, it arose more forcefully from defendant's five convictions of first degree murder with special circumstances, one occurring in jail, and his admission to a sixth, uncharged homicide. The evidence of these killings and their attendant violence so completely overshadows the evidence of defendant's escape attempts that the latter cannot significantly have enhanced the jury's perception of him as a violent man.

■ Defendant also argues that it was error to admit evidence of three instances in which he possessed weapons in jail. We disagree.

While defendant was in the Alameda County jail awaiting trial, sheriff's deputies found a double-edged razor blade in his cell. A prisoner in the jail is not permitted to possess a razor blade unless locked into a safety razor, from which the blade cannot be removed without a key. This incident occurred on May 4, 1982, five days before defendant killed Johnson. Three months later, on August 6, deputies found a stabbing weapon in defendant's cell. The weapon consisted of a straightened, sharpened, heavy-duty paper clip protruding from the end of the plastic barrel of a ballpoint pen, which had been melted at the end to hold the metal tip in place. Finally, on August 10, deputies confiscated a telephone cord as defendant was returning from a visitor's booth.

In *People* v. *Harris* (1981) 28 Cal.3d 935, 962-963 [171 Cal.Rptr. 679, 623 P.2d 240], we held that a prisoner's "[p]ossession of [a] garrote and [a] knife clearly involved an implied threat to use force or violence." Defendant argues that we should reach a different conclusion in this case because the evidence is consistent with innocent, or less culpable, explanations for his possession of the articles in question. Specifically, defendant contends the evidence would have permitted the inferences that he was unaware of the razor blade, that the pen was a tattoo needle instead of a stabbing weapon, and that he stole the telephone cord as a prank and not to obtain a garrote.

The availability of an innocent explanation for criminal activity, however, does not make the evidence of criminal activity inadmissible. Instead, the innocent explanation merely raises an ordinary evidentiary conflict for the trier of fact. Moreover, in previous cases we have not required evidence beyond a prisoner's possession of a deadly weapon to show an implied threat of violence. (See *People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1186-1187 [270 Cal.Rptr. 286, 791 P.2d 965]; *People* v. *Harris, supra,* 28 Cal.3d at p. 963.) For these reasons, we hold that the trial court did not err by admitting the evidence.

### C. *Richard Martinez's Testimony*

Defendant makes several contentions related to the testimony of Richard Martinez, one of the People's witnesses at the penalty phase. Martinez, an official of the Department of Corrections, testified generally about the conditions of confinement for prisoners sentenced to life imprisonment without the possibility of parole. Arguing that Martinez's testimony was false, defendant contends that its admission violated his rights under the due process clause and the Eighth Amendment. Defendant also contends, in the event Martinez's testimony is found not to have been false, that its admission nevertheless compelled the granting of his motion for a new trial. We reject both arguments.

### 1. *The Trial Court's Ruling*

The prosecution called Martinez in rebuttal. Defense counsel objected on each of the grounds now reasserted on appeal. The prosecutor argued that evidence at the penalty phase, including testimony elicited by the defense, had left the jury with the misleading impression that prison administrators had the ability to isolate defendant completely from other inmates for life. The prosecutor offered Martinez's testimony to show that prisoners cannot be isolated for more than a year without redetermining the necessity for continuing such treatment.

The trial court accepted the prosecutor's argument, reasoning that Martinez's testimony was admissible either as rebuttal or as evidence relating to defendant's "sentence" (§ 190.3) and, thus, part of the prosecution's case-in-chief. The court ruled that it would "allow [Martinez's testimony] either through granting [a] request to reopen or just simply calling it rebuttal. I don't think it makes any difference." The court also offered the defense a continuance to secure additional evidence, which was declined.

### 2. *Defendant Has Not Shown That Martinez Testified Falsely*

Defendant first argues that Martinez testified falsely that an inmate can be isolated from other prisoners for a maximum period of one year. We

reject the argument because it depends upon an argumentative misconstruction of the testimony in question.

We summarize Martinez's brief testimony: At the time of trial, Martinez was employed by the Department of Corrections as a program administrator. Through his position, Martinez was familiar with the rules and regulations that governed the placement and classification of prisoners. According to Martinez, an inmate sentenced to life without the possibility of parole would be held at a reception center for three to four weeks for initial processing and then transferred to a prison, probably San Quentin or Folsom. Once in a prison, it would not ordinarily be possible to isolate an inmate completely from other inmates. Even in a secured housing unit, an inmate usually would still be permitted to mingle with similarly classified prisoners in the exercise yard and showers. Limited exceptions were made for prisoners designated as "walk-alones," who exercised in smaller groups or by themselves.

Martinez also testified about the permissible duration of an inmate's assignment to a secured housing unit. Defendant argues that Martinez misled the jury into believing that the Department of Correction's regulations did not permit isolation of a prisoner for more than a single year, even if the inmate posed a danger to others. The record, however, shows defendant's interpretation to be unreasonable. We quote the relevant exchange in full:

"Q [By the prosecutor]. Now, this as you've indicated, this is your maximum security housing and the law that regulates the department of corrections says that you can only keep a prisoner under these conditions for a maximum of one year; is that right?

"A [By Martinez]. Yes, sir.

"Q. After the year has ended or, let's say, the maximum period of time has expired, is that prisoner then released into the general prison population?

"A. Under the law, he's to be *unless he fits into three areas which would enable us to keep him retained in the lockup unit.*

"Q. Do these include someone who commits a new crime while he's in the lock-up unit?

"A. Yes, sir.

"Q. Or a serious rule violation?

"A. Yes, sir.

"Q. Now, absent that, let's say the person exists in the lock-up, the maximum security unit and does not commit the new crime, does not commit the serious rule violation, things like that and the year maximum expires; is he then eligible and does the law mandate that he be released into the general prison population?

"A. Yes, sir." (Italics added.)

Defendant has asked that we take judicial notice of the Department of Corrections' "Classification Manual" (Manual) in effect during the relevant time period. The request is granted. The Manual confirms the accuracy of Martinez's testimony. According to the Manual, inmates could be placed in a secured housing unit for an "indeterminate term" because of serious disciplinary violations (Manual, § 3622(a)), because a serious disciplinary proceeding was pending (*id.*, § 3617(d)(1)), or because "[t]he inmate pose[d] a definite and serious threat to the physical safety of the institution, other inmates, staff, or himself" (*id.*, § 3617(d)(2)). In every case, however, as Martinez testified, the Manual required review "[o]n a yearly basis" "to determine whether continued SHU housing is appropriate." (*Id.*, §§ 3621(c), 3622(d).)[19]

To summarize, the Manual provided that an inmate could not be kept in a secured housing unit without review "[o]*n a yearly basis*" to determine whether such housing continued to be "*appropriate*." (Manual, §§ 3621(c), 3622(d), italics added.) Consistent with the Manual, which defendant urges us to accept as controlling law, Martinez testified that an inmate had to be returned to the general population after one year "*unless he fits into [a*

---

[19] The department adopted these provisions in response to *Wright* v. *Enomoto* (N.D.Cal. 1976) 462 F.Supp. 397 (*Wright*), affd. *sub nom. Enomoto* v. *Wright* (1978) 434 U.S. 1052 [55 L.Ed.2d 756. 98 S.Ct. 1223]. In *Wright*, the federal district court found that prison administrators had "consistently confined prisoners in maximum security segregation for administrative reasons without first giving them any meaningful hearing." (*Wright, supra,* 462 F.Supp. at p. 400.) The court also ordered the Department of Corrections to afford due process procedural safeguards to prisoners so confined. (*Id.*, at pp. 404-405.)

Based on the federal court's factual findings in *Wright*, a 1976 decision, defendant argues that Martinez's testimony was false because the Department of Corrections at the time of *Wright* "ha[d] long engaged in [the] practice" of holding inmates in secured housing units for more than a year without procedural safeguards. Defendant's argument ignores the effect of the *Wright* decision. The Manual, adopted in 1977 and revised in 1982, expressly refers to the *Wright* decision and adopts the procedural safeguards that the federal court ordered. (Manual, § 3621(a).)

*category*] *which would enable us to keep him retained in the lockup unit.*" (Italics added.)

Thus, we reject defendant's argument that Martinez testified falsely. Because the testimony was not false, there is no need to consider defendant's additional arguments that it would have violated the due process clause and the Eighth Amendment to permit the jury to consider false testimony at the penalty phase.

### 3. *Additional Arguments About Martinez's Testimony*

Defendant also argues, regardless of the accuracy of Martinez's testimony, that its admission compelled the court to grant a motion for a new trial. Defendant moved for a new trial on the grounds that Martinez's testimony (a) was not proper rebuttal; (b) was not authorized by section 190.3; (c) violated *People* v. *Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446]; (d) invited the jury to speculate; and (e) should have been excluded under Evidence Code section 352. We reject each argument.

### a. *Scope of rebuttal*

The trial court admitted Martinez's testimony to rebut the inference, which arose from evidence already presented in the penalty phase, that defendant was being held, and could continue to be held, in strict isolation from other prisoners. The record supports the court's ruling.

Evidence about defendant's confinement came before the jury during the proof of defendant's two escape attempts from the Alameda County jail. The prosecution showed through the testimony of a guard that an inmate trustee had passed articles to defendant, including a carborundum saw, while defendant was in administrative segregation. On cross-examination, defense counsel introduced photographs of defendant's cell and otherwise attempted to show that the conditions of administrative segregation made this impossible. Defense counsel also raised the wholly unrelated subject of defendant's behavior in jail after killing Johnson. Counsel asked a guard, who had occasionally exercised with defendant in the jail, whether defendant had ever "caused . . . any problems during these exercise periods?" The guard answered in the negative.

On recross-examination, defense counsel reinforced the theme that prison officials could isolate defendant and that, under strict supervision, defendant was not dangerous. Although the prosecution still had not touched upon the subject, defense counsel examined the guard again about his exercise sessions with defendant. First, counsel elicited testimony to the effect

that defendant and the guard had exercised in close proximity with heavy barbells. Next, counsel asked the guard three times to confirm that no rule required that defendant be let out of his cell. Counsel asked, for example, "It's not part of the rules or regulations [of] the courthouse jail that you take [defendant] out of his cell to work . . . with these weights?" Finally, counsel asked the guard three times to confirm that, during these exercise sessions, defendant had "never assaulted" the guard or "attempted to strike [him] with any of these weights?" The guard answered each of defense counsel's questions in the negative.

In view of the evidence about defendant's confinement, the trial court could reasonably have concluded that the jury had been left with a misleading impression about the conditions under which defendant would be held if sentenced to life without possibility of parole. Because the defense had elicited some of this evidence and exploited it in an attempt to show that defendant was not dangerous, Martinez's testimony was arguably proper rebuttal.[20] For the same reason, admission of Martinez's testimony as rebuttal did not contravene our holding in *People* v. *Grant* (1988) 45 Cal.3d 829, 861 [248 Cal.Rptr. 444, 755 P.2d 894], that evidence in aggravation must relate to the "deeds or the character" of the defendant.

Alternatively, assuming for the sake of argument that Martinez's testimony did not constitute proper rebuttal, its introduction was clearly harmless. Two reasons support this conclusion. First, Martinez testified generally about the rules regarding classification; he did not purport to predict how defendant would be housed. This generality permitted defense counsel to minimize Martinez's testimony by arguing to the jury that Martinez "could not tell you for certain how David Mason specifically will be evaluated or placed in prison, should David Mason be sentenced to life without possibility of parole. In fact, when you think back on it, Mr. Martinez never even mentioned David Mason's name." Second, defendant stood convicted of five brutal murders, and the penalty phase jury had heard evidence of twelve instances of criminal conduct, including a sixth murder and many armed robberies. In view of the number and callousness of defendant's crimes and the absence of substantial mitigating evidence, it is not reasonably possible that the jury would have rendered a different verdict had the challenged testimony not been admitted. (See *People* v. *Brown* (1988) 46 Cal.3d 432, 449 [250 Cal.Rptr. 604, 758 P.2d 1135].)

[20] In connection with the motion to exclude Martinez's testimony, there was discussion about whether defense counsel had "opened the door" to such testimony by statements during voir dire. During voir dire, defense counsel had asked prospective jurors whether they favored life imprisonment or death for someone who had killed while in prison. We have, however, never looked to attorneys' statements during voir dire to determine whether evidence is admissible at the penalty phase.

### b. *Admissibility of Evidence Regarding the "Sentence" Under Section 190.3*

The trial court, as already noted, relied upon section 190.3 as an alternative ground for admitting Martinez's testimony. Section 190.3 provides that, "[i]n the proceedings on the question of penalty, evidence may be presented by both the People and the defendant as to any matter relevant to aggravation, mitigation, and *sentence* . . . ." (Italics added.) In view of our conclusion that Martinez's testimony was either properly admitted as rebuttal or, alternatively, harmless, we need not determine whether the testimony would have been admissible as a "matter relevant to . . . [the] sentence." (§ 190.3.)

### c. *Alleged Murtishaw Error*

██ The trial court concluded that Martinez's testimony about the conditions of confinement did not violate our decision in *People* v. *Murtishaw, supra,* 29 Cal.3d 733. We agree. *Murtishaw* is wholly inapplicable to this case. In *Murtishaw* we held that it was error to permit a psychiatrist "to testify over objection as to his opinion respecting [the] defendant's future behavior." (*Id.,* at p. 774.) In contrast to the testimony we criticized in *Murtishaw,* Martinez's testimony did not address the subject of future dangerousness. Instead, Martinez discussed in general terms the conditions of confinement for prisoners sentenced to life without possibility of parole. He did not mention defendant or the subject of violence by inmates.

### d. *Invitation to Speculate*

Defendant argues that Martinez's testimony was improper because it invited the jury to speculate that future action by prison administrators might result in defendant being mixed with other inmates. Defendant analogizes to *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430], in which we held that an instruction concerning the Governor's power to commute a sentence diverted the jury from its proper function by inviting them to speculate on future events. (*Id.,* at pp. 155-159.) Even if the analogy were valid, it would not support a finding of error in this case. Martinez's testimony came in as rebuttal only after defendant raised and exploited the inference that he could be isolated from other prisoners.

### e. *Evidence Code Section 352*

We also reject defendant's argument that the trial court should have exercised its discretion to exclude Martinez's testimony under Evidence Code section 352. Any risk of undue prejudice was arguably outweighed by

the need to rebut the misleading inference that defendant could be isolated perpetually from other inmates. Moreover, as already discussed, even if Martinez's testimony did not constitute proper rebuttal its admission was harmless.

### D. *Booth/Gathers Claims*

Defendant argues that the Eighth Amendment requires reversal because the prosecutor presented evidence of, and referred in argument to, the impact of defendant's crimes on his victims and their relatives. (Cf. *Booth* v. *Maryland* (1987) 482 U.S. 496, 502-509 [96 L.Ed.2d 440, 448-453, 107 S.Ct. 2529]; *South Carolina* v. *Gathers* (1989) 490 U.S. 805, 810-812 [104 L.Ed.2d 876, 882-884, 109 S.Ct. 2207, 2210-2211].) We disagree.[21]

The evidence that defendant claims was improper under *Booth* v. *Maryland, supra,* was in fact properly admitted to prove the circumstances of charged and uncharged crimes. (See *id.,* 482 U.S. at p. 507 [96 L.Ed.2d at p. 451]; see also *People* v. *Clark* (1990) 50 Cal.3d 583, 629 [268 Cal.Rptr. 399, 789 P.2d 127].) Defendant complains about the testimony of the friends and relatives who discovered the bodies of Picard, Jennings, Brown, and Lang and their burglarized dwellings. But because the issue of penalty was retried before a new jury, it was necessary to present again at the penalty phase much of the evidence originally introduced at the guilt phase.

Defendant also complains that the prosecutor called Betty Janssen, the sister of Virginia Janssen, whom defendant stabbed with an ice pick while robbing the Western Welding Supply Company. Virginia died of unrelated heart problems before the trial. The only purpose of Betty's brief testimony, which was admitted without objection, was to establish from personal knowledge that Virginia's death had no connection with the wounds she had received in the robbery. If the prosecutor had not explained Virginia's natural death to the jury, we would probably be faced with a claim that the jury had been misled by the implication that defendant was responsible for a seventh homicide.

While we thus find nothing improper in the prosecutor's evidentiary presentation, he also made arguments about the impact of defendant's crimes. Six years after the trial in this case the United States Supreme Court held that it was improper for a prosecutor to "read[] at length from [a]

---

[21] We review these claims despite counsel's failure to object solely because the trial occurred before the United States Supreme Court decided *Booth* v. *Maryland, supra,* and *South Carolina* v. *Gathers, supra.* (See *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1031, fn. 15 [245 Cal.Rptr. 185, 750 P.2d 1342].) For the same reason, it is inaccurate to describe the claimed impropriety as misconduct. (*Ibid.*)

religious tract the victim [in that case] was carrying, and comment[] on the [victim's] personal qualities . . . ." (*South Carolina v. Gathers, supra,* 490 U.S. at p. 811 [104 L.Ed.2d at p. 883, 109 S.Ct. at p. 2211].) The high court disapproved of this argument because it did not relate to the defendant's moral culpability, on which the capital sentencing decision must focus. (*Ibid.* [104 L.Ed.2d at p. 883, 109 S.Ct. at p. 2211.])

The prosecutor's comments were offensive under the rule later adopted in *Gathers.* To summarize, the prosecutor asked the members of the jury to "put [themselves] behind the eyes and in the mind and in the memories of the relatives and friends," and said that the relatives would "weep" for the victims. These comments are essentially the same as those we found harmless in *People v. Stankewitz* (1990) 51 Cal.3d 72, 112 [270 Cal.Rptr. 817, 793 P.2d 23] ["imagine the loss you would feel if someone close to you were taken from you or murdered at a young age for no reason at all. Then multiply that, because there were many persons, family and friends, who would miss [the victim]"], *People v. Burton* (1989) 48 Cal.3d 843, 868 [258 Cal.Rptr. 184, 771 P.2d 1270] [" 'put yourselves . . . in [the relatives'] position and imagine the loss' "], and *People v. Ghent, supra,* 43 Cal.3d at page 772 [" 'think about how you would feel if it were your baby' "].

In view of the number and callousness of defendant's crimes, obvious comments to the effect that his crimes caused suffering cannot have had an appreciable effect on the jury's deliberations. Although the prosecutor's comments were improper, we are persuaded that the error was harmless beyond a reasonable doubt. (*People v. Stankewitz, supra,* 51 Cal.3d at p. 112; *People v. Ghent, supra,* 43 Cal.3d at p. 771.)

### E. *Alleged Easley Error*

The trial court instructed the jury in the unadorned language of section 190.3, factor (k), the "catch-all" mitigating factor, rather than in the language we suggested in *People v. Easley* (1983) 34 Cal.3d 858, 878, footnote 10 [196 Cal.Rptr. 309, 671 P.2d 813].[22] Defendant contends that his sentence must be reversed because the jury was not specifically told that it could consider any evidence, whether or not connected with the crimes,

---

[22] The court instructed the jury on December 16, 1983, nine days after our opinion in *Easley, supra,* became final. Based on *Easley* the court correctly declined to give the antisympathy instruction (CALJIC No. 1.00) that we held to be erroneous at the penalty phase. (*Easley, supra,* 34 Cal.3d at pp. 875-880.) However, during the instructional conference neither the court nor counsel mentioned or appeared to be aware of the *Easley* opinion's footnote 10, in which we stated that trial courts, "to avoid potential misunderstanding in the future . . . should inform the jury that it may consider as a mitigating factor . . . any other 'aspect of the [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' " (*Id.,* at p. 878, fn. 10.)

" 'proffer[ed] as a basis for a sentence less than death.' " (*Ibid.*, quoting from *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954].)

To the extent defendant's claim is based on the Eighth Amendment, it is obviated by *Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190], in which the United States Supreme Court rejected an identical claim. The high court's discussion of the jury's probable interpretation of factor (k) is equally applicable here: "The instruction did not, as petitioner seems to suggest, limit the jury's consideration to 'any other circumstance *of the crime* . . . .' " (494 U.S. at p. __ [108 L.Ed.2d at p. 330, 110 S.Ct. at p. 1199], italics in original.) Instead, "[t]he jury was directed to consider any other circumstance [which extenuates the gravity of the crime], which certainly includes a defendant's background and character." (*Ibid.* [108 L.Ed.2d at p. 330, 110 S.Ct. at p. 1199], fn. omitted.) Moreover, "[o]ther factors . . . allow for consideration of mitigating evidence not associated with the crime itself, such as the absence of prior criminal activity by a defendant, the absence of prior felony convictions, and youth. When factor (k) is viewed together with those instructions, it seems even more improbable that jurors would arrive at an interpretation that precludes consideration of all non-crime-related evidence." (*Id.*, at p. __ [108 L.Ed.2d at p. 331, 110 S.Ct. at p. 1199].)

Nor is it probable that the prosecutor's argument caused the jury to disregard mitigating evidence unrelated to defendant's crimes. To the contrary, the prosecutor specifically told the jury that it was *"obviously entitled to consider any evidence* presented on behalf of the defendant or presented by any side that you consider to be truly mitigating evidence and you may weigh it, what weight you give to it and what value you assign to it and what role it plays in your deliberations is entirely up to you." (Italics added.) In addition, much of the prosecutor's argument was dedicated to addressing the evidence about defendant's childhood—the same evidence that defendant now claims the jury might have believed it was not permitted to consider.

While the prosecutor argued that the mitigating evidence concerning defendant's background was not persuasive—"[i]t's simply not mitigation at all"—he never suggested that the jury could not consider such evidence. "[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (*Donnelly* v. *De Christoforo* (1974) 416 U.S. 637, 647 [40 L.Ed.2d 431, 439, 94 S.Ct. 1868]; see also *Boyde* v. *California, supra,* 494 U.S. at p. __ [108 L.Ed.2d at p. 332, 110 S.Ct. at p. 1200].) This is especially true when, as here, the prosecutor specifically told the jury that it

was *"obviously entitled to consider any evidence* presented on behalf of the defendant." (Italics added.)

For these reasons, we reject defendant's claim that the sentence must be reversed because the trial court instructed in the language of factor (k) rather than the language suggested in *People* v. *Easley, supra.*

## F. *Miscellaneous Contentions*

Defendant asks us to reconsider the following holdings: (1) that the trial court need not instruct sua sponte on the elements of unadjudicated crimes admitted as evidence in aggravation (*People* v. *Heishman* (1988) 45 Cal.3d 147, 183-184 [246 Cal.Rptr. 673, 753 P.2d 629]); (2) that the jury may consider prior violent criminal acts as evidence in aggravation (§ 190.3, factor (b)), even though the defendant committed them as a juvenile (*People* v. *Lucky* (1988) 45 Cal.3d 259, 294-296 [247 Cal.Rptr. 1, 753 P.2d 1052]); (3) that the trial court need not delete inapplicable aggravating and mitigating factors from the jury instructions (*People* v. *Ghent, supra,* 43 Cal.3d at pp. 776-777); and (4) that the jury need not determine that aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113]). We decline to reconsider these holdings.

Defendant also argues that the 1978 death penalty statute is unconstitutional because: (1) it does not specify which factors are aggravating and which are mitigating; (2) it does not expressly exclude nonstatutory aggravating factors; (3) it does not require written findings on the existence of aggravating factors; (4) it does not require aggravating factors to be proved beyond a reasonable doubt; (5) it does not require jury unanimity on aggravating factors; and (6) it does not require an appellate court to review the sentence for proportionality. We have previously rejected each of these contentions (e.g., *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-779) and decline to reconsider the decisions in which we did so.

## V. DISPOSITION

The judgment is modified by striking all but one of the multiple-murder special-circumstance findings under Penal Code section 190.2, subdivision (a)(3). In all other respects the judgment is affirmed.

Lucas, C. J., Mosk, J., Kennard, J., Arabian, J., and Eagleson, J.,* concurred. Broussard, J., concurred in the judgment.

Appellant's petition for a rehearing was denied March 13, 1991.

---

* Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.