Filed 8/17/15  P. v. Jackson CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B253823 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA125101) |
| v. | |
| ALBERT JACKSON, JR., | |
| Defendant and Appellant. | |

APPEAL from the judgment of the Superior Court of Los Angeles County, John T. Doyle, Judge.  Affirmed.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II and Tannaz Kouhpainezhad, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Albert Jackson, Jr. was found guilty of first degree murder following a jury trial with true findings on related firearm-use and criminal street gang enhancements. On appeal Jackson contends the trial court committed prejudicial error in instructing the jury it could consider flight as indicating consciousness of guilt under the circumstances of this case and the evidence of the Ten Line Gangster Crips' primary activities was insufficient to support the criminal street gang finding. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Information*

Jackson was charged by information with the murder of Willie Myles (Pen. Code, § 187, subd. (a)).[1] It was specially alleged that Jackson had personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (b), (c), (d)) and the offense was committed for the benefit of a criminal street gang. (§ 186.22, subd. (b).)[2] Jackson pleaded not guilty and denied the special allegations.

2. *Trial*

According to the evidence at trial Myles was a regular at the bus stop at 1717 E. 103rd St. in Los Angeles where he talked to students waiting for the bus in the morning and sometimes mentioned the Grape Street Crips. The People's gang expert testified the bus stop was located within Grape Street Crips territory. One witness told police investigators he had heard Myles claim to be a member of that gang.

Several days before the shooting on October 4, 2007 a young man on a bicycle approached Myles and engaged him in conversation. The man on the bike told Myles not to "talk smack"; Myles replied, "I don't give a shit about blank street."

On the morning of October 4, 2007 witnesses observed Myles standing across the street from the bus stop, shouting at another man about an arm's distance from him. The

---

[1] Statutory references are to this code.

[2] For simplicity on occasion this opinion uses the shorthand phrase "to benefit a criminal street gang" to refer to crimes that, in the statutory language, are committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b); see *People v. Jones* (2009) 47 Cal.4th 566, 571, fn. 2.)

man pointed a gun at Myles and asked, "Where are you from?" After Myles responded, the man shot Myles twice with a semiautomatic firearm and ran to a waiting, white 1980's model two-door car. The shooter jumped into the passenger seat of the car, which then sped away. While he was running toward the car, the shooter's house slippers fell off his feet. Myles died in the hospital three weeks later as the result of a gunshot wound to the chest.

a. *Eyewitness testimony*

At trial the People presented the testimony of several eyewitnesses. Carmen Rivera, who was standing across the street at the time of the shooting, testified a man approached Myles, argued with him, pulled out a gun, shot him and ran back to a two-door white car, with his slippers falling off during flight. She had identified Jackson as the shooter from a photographic lineup. Letitia Sandoval, who was driving through the area, testified that she saw an African-American man carrying a gun and walking toward a white car. Jose Vallejo, who was stopped at a traffic light, heard an "explosion" and saw through his rearview mirror the shooter walking toward a white car. He identified Jackson in a photographic lineup.

b. *DNA evidence*

DNA evidence from hairs collected from the slippers left on the road was also introduced. After the hairs were tested, six potential candidates, including Jackson, were identified through CODIS (Combined DNA Index System). Comparison with a buccal swab from Jackson confirmed a DNA match. According to the People's criminalist, on average only one person out of seven billion unrelated individuals would have that DNA profile.

c. *Gang evidence*

Los Angeles Police Detective Jose Carias testified as the People's gang expert. Carias explained aspects of gang culture, including the consequences of disrespecting a gang, and described the history, territory, dress and criminal activity of the Ten Line Gangster Crips, a small African-American street gang. Specifically, Carias testified that

3

"murder, shootings, robberies, burglaries, narcotic sales" are among the gang's primary activities:

"Q. Now I want to ask you are you familiar with the primary activities. In order—in other words, the types of crimes that are committed by Ten Line Gangster Crips.

"A. Yes.

"Q. And how are you familiar with those?

"A. Through personal investigations, through expert testimony such as this, and also through speaking to other detectives and officers with knowledge of Ten Line Gangster Crips.

"Q. And what are some of the primary activities or the chief crimes committed by the Ten Line Gangster Crips?

"A. Murder, shootings, robberies, burglaries, narcotic sales.

[¶] . . . [¶]

"Q. . . . [A]re you personally familiar with crimes and investigations [*sic*] committed by Ten Line Gangster Crips?

"A. Yes, I am.

"Q. And what do some of those crimes include?

"A. Again, murder, shootings, robberies, burglaries, and narcotic sales."

Detective Carias also testified that Myles was killed in an area claimed by the Grape Street Crips, although openly traveled by many other gang members, and that at the time of the shooting the Ten Line Gangster Crips and Grape Street Crips were rivals whose feud frequently resulted in acts of violence against each other's members. Jackson was an admitted member of the Ten Line Gangster Crips.[3]

---

[3]   The evidence Jackson was a member of Ten Line Gangster Crips included testimony from Los Angeles County Police Officers James Cullen and Frank Marino that a field identification card for Jackson created in 2007 documented his status as an admitted member of the Ten Line Gangster Crips and indicated he had a tattoo on his left arm that read R.I.P. Apeo and a tattoo on his back that read Apeo; Jackson went by the gang moniker Baby Apeo. Detective Carias testified his partner had filled out a field

Given a hypothetical based on the facts of the case, Detective Carias opined the shooting was committed for the benefit of the Ten Line Gangster Crips: "The fact that [the victim] openly and overtly is expressing his allegiance for Grape Street and a Ten Line Gangster Crip Member who happened to be one of their main rivals is passing by goes to respect and lack thereof. The Ten Line Gangster Crip member felt that there was a lack of respect there because this individual was so overtly expressing his allegiance to Grape Street. . . . The benefit is that it creates a sense of fear and intimidation within the community. . . . Another benefit would be that a shooting or an act of violence of this nature elevates the status of the specific gang member who committed it and plus subsequently elevates the status of the gang he belongs to. It also instills fear not only in rival gangs but in gangs that Ten Line Gangster Crips might have an allegiance with." Carias further opined it was "actually very common" for a gang member to go into a rival gang's territory to send a message by committing an act of violence: "It's usually a rival going into your rival's territory to commit the crime."

d. *Jackson's defense*

Jackson's sole defense at trial was mistaken identity: His counsel argued Jackson was not the shooter. Jackson did not testify on his own behalf. Neither of the witnesses who testified for the defense presented any evidence relevant to the criminal street gang enhancement allegation.

3. *The Verdict and Sentence*

The jury convicted Jackson on the single count of murder and found true the special allegations Jackson had intentionally discharged a firearm causing great bodily injury or death and the crime had been committed for the benefit of a criminal street gang. Jackson was sentenced to an aggregate indeterminate state prison term of 50 years to life, consisting of 25 years to life for first degree murder (§ 187, subd. (a)), plus a consecutive term of 25 years to life for the firearm-use enhancement (§ 12022.53,

identification card for Jackson in 2008 that also indicated Jackson was a member of the Ten Line Gangster Crips and went by the moniker Little Apeo.

subd. (d)), with a minimum parole eligibility of 15 years for the criminal street gang enhancement (§ 186.22, subd. (b)(5)).

## DISCUSSION

### 1. *The Court Did Not Err in Instructing with CALCRIM No. 372*

Over Jackson's objection the trial court instructed the jury pursuant to CALCRIM No. 372: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself." This instruction and its substantially identical predecessor CALJIC No. 2.52 are authorized in appropriate cases by section 1127c, which requires the court to instruct the jury in any case in which evidence of flight of a defendant is relied upon as tending to show guilt that, if flight has been proved, the jury may infer consciousness of guilt but that such flight alone "is not sufficient in itself to establish his [or her] guilt. . . . The weight to which such circumstance is entitled is a matter for the jury to determine." (§ 1127c.)

Jackson contends it was improper to instruct on flight as evidence of consciousness of guilt when the sole issue at trial was the perpetrator's identity because the jury could not find that he had fled the crime scene unless it first found he was the gunman. The instruction in these circumstances, he insists, was "circular and confusing."[4] In addition, he argues, the instruction invited the jury to interpret the

_____

[4]     Several federal appellate courts have criticized the use of false-statement consciousness-of-guilt instructions when the jury could only find the exculpatory statements by the defendant were false if they had concluded other evidence established the defendant's guilt. (See, e.g., *United States v. Littlefield* (1st Cir. 1988) 840 F.2d 143, 149 ["In effect, the jurors were told [based on a consciousness of guilt instruction] that once they found guilt, they could find consciousness of guilt, which in turn is probative of guilt. That is both circular and confusing."]; *United States v. Durham* (10th Cir. 1998) 139 F.3d 1325, 1332 ["The only way the jury could find that the statements at issue in this case were false would be to conclude that Durham was a member of Montgomery's cocaine distribution conspiracy. That conclusion would necessarily render irrelevant consciousness of guilt. This circularity problem recurs whenever a jury can only find an exculpatory statement false if it already believes other evidence directly establishing

6

instruction as a directed finding on the issue of identity although he fails to explain why that was so.

Jackson's challenge to CALCRIM No. 372 is premised on the analysis in *People v. Anjell* (1979) 100 Cal.App.3d 189, in which the Court of Appeal held it was not proper to give a flight instruction in that case based on flight that had occurred immediately after a crime because identity was at issue and "[t]he fact that a robber fled the scene is of no assistance to a jury where the defendant does not dispute that all elements of the crime were present but denies he was the robber." (*Id.* at pp. 199-200.) "This is so because where the defendant contests his identity as the perpetrator, testimony that the perpetrator (whoever he was) fled the scene upon committing the crime does not, in any logical way, further reconnect the *defendant* with the commission of the crime." (*People v. Rhodes* (1989) 209 Cal.App.3d 1471, 1476.) However, as the *Rhodes* court explained, *Anjell* did not stand for the "sweeping proposition" that a flight instruction should never be given when the identity of the perpetrator is a contested issue: "[F]or example, where there is independent evidence of flight as to which defendant's identity as the fleer is not in dispute, CALJIC No. 2.52 is proper." (*Rhodes*, at p. 1476.)

The propriety of a flight instruction when identity is disputed was confirmed by the Supreme Court in *People v. Mason* (1991) 52 Cal.3d 909, 943, which rejected an argument similar to that being made by Jackson and disapproved as "overly broad dictum" any contrary language in *People v. Anjell*, *supra*, 100 Cal.App.3d 189. (See *Mason*, at p. 943 & fn. 13.) The *Mason* Court held, "If there is evidence identifying the person who fled as the defendant, . . . then it is proper to instruct on flight. [Citation.] 'The jury must know that that it is entitled to infer consciousness of guilty from flight and

guilt. Under such circumstances, it is error to give a false exculpatory statement instruction."].) The California Supreme Court, however, has rejected this circularity argument. (See *People v. Bacon* (2010) 50 Cal.4th 1082, 1108 [upholding propriety of instruction that jury could infer consciousness of guilt from efforts to suppress evidence, rejecting contention the instruction was "logically circular" because the jury would first have to resolve the ultimate question whether defendant had committed the charged crimes]; see also *People v. Jurado* (2006) 38 Cal.4th 72, 124 [consciousness of guilt based on flight].)

that flight, alone, is not sufficient to establish guilt. [Citation.] The jury's need to know these things does not change because identity is also an issue. Instead, such a case [only] requires the jury to proceed logically by deciding first whether the [person who fled] was the defendant and then, if the answer is affirmative, how much weight to accord to flight in resolving the other issues bearing on guilt. The jury needs the instruction for the second step.'" (*Mason*, at p. 943.)

Here, although the shooter, like the robber in *Anjell,* fled immediately after the crime had been committed, DNA evidence from hairs on the house slippers found in the road near where Myles was shot identified Jackson as the person who ran from the crime scene and entered the waiting car. Thus, separate from the eyewitnesses who selected Jackson as the shooter from photographic lineups, there was independent evidence of Jackson's identity as the fleer that was essentially undisputed. Accordingly, whether or not it might be error to instruct that consciousness of guilt may be inferred from flight when identity is in dispute and there is no substantial evidence of flight by the defendant apart from his or her identification as the perpetrator, under *People v. Mason, supra*, 52 Cal.3d 909, it was entirely proper instruct with CALCRIM No. 372 in this case.

In any event, because it is not reasonably probable Jackson would have obtained a more favorable result had the instruction not been given, any error in instructing pursuant to CALCRIM No. 372 was harmless. (See *People v. Turner* (1990) 50 Cal.3d 668, 695 [any error in giving flight instruction to be evaluated under *People v. Watson* (1956) 46 Cal.2d 818, 836 standard of prejudice].) First, by its express terms, as required by section 1127c, CALCRIM No. 372 leaves the factual determination of flight, as well as its significance, to the jury, and informs the jury that evidence of flight alone is not sufficient to find the defendant guilty. It "merely permitted the jury to consider evidence of flight in deciding the defendant's guilt or innocence; it did not suggest that the jury should consider such evidence as dispositive." (*People v. Carter* (2005) 36 Cal.4th 1114, 1183.) The instruction neither creates an unconstitutional permissive inference nor

impermissibly lessens the prosecutions burden of proof. (*People v. Mendoza* (2000) 24 Cal.4th 130, 179, 181.)[5]

Second, the evidence of Jackson's guilt, which included both eyewitness testimony and DNA evidence directly linking him to the crime scene, was strong. Flight was but a minor point against Jackson.

2. *Substantial Evidence Supports the Jury's True Finding on the Criminal Street Gang Enhancement*

To obtain a true finding on a criminal street gang enhancement allegation, the People must prove the underlying offense was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) As used in this statute, "'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated [in portions of section 186.22, subdivision (e)], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) That definition "necessarily exclude[s] the occasional commission of those crimes by the group's members." (*Ibid.*)

Jackson acknowledges, as he must, that murder, robbery, burglary and the sale of controlled substances are among the statutorily enumerated crimes pertinent to

---

[5] Even the court in *People v. Anjell*, *supra*, 100 Cal.App.3d 189, after finding it error to give the instruction, concluded the error was harmless: "If the jurors had followed CALJIC No. 2.52 literally, they would not have accorded any significant weight to so-called evidence of flight. It was therefore not reasonably probable that a result more favorable to appellant would have been reached if the instruction had been omitted." (*Id.* at p. 202.)

establishing the Ten Line Gangster Crips as a criminal street gang (see § 186.22, subd. (e)(2), (3), (4) & (11); see also § 186.22, subd. (e)(5) [shooting at an inhabited dwelling or occupied motor vehicle]) and concedes for purposes of his appeal that Detective Carias was qualified to provide an expert opinion that commission of one or more of those crimes was a primary activity of the Ten Line Gangster Crips. Nonetheless, focusing close attention on language in the prosecutor's questions, rather than Carias's answers, Jackson argues his expert testimony, which we have quoted above, did not constitute substantial evidence of the gang's primary activities within the meaning of section 186.22.[6]

To construct this argument Jackson contends the prosecutor initially misdefined primary activities as generally meaning "the types of crimes that are committed by Ten Line Gangster Crips." Then, when she asked Carias the primary activities question, the prosecutor improperly equated "primary activities" and "chief crimes." The combination of these two errors, Jackson posits, is that Carias's testimony only established which crimes are most frequently committed by the Ten Line Gangster Crips, not whether commission of the identified crimes is a principal or chief activity or occupation of the group. The creative example Jackson gives is that a gang could have committed only two crimes in its lengthy history, both murders. Murder would, therefore, be its chief crime, but not necessarily one of its primary activities. (Cf. *People*

---

[6]     "In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60); accord, *People v. Livingston* (2012) 53 Cal.4th 1145, 1170.) "The relevant facts must, however, meet the statutory requirements for a gang enhancement in order for it to apply." (*People v. Garcia* (2014) 224 Cal.App.4th 519, 523.)

*v. Sengpadychith, supra*, 26 Cal.4th at pp. 323-324 [isolated criminal conduct is not enough to establish gang's primary activities include commission of crimes listed in statute].)

We agree the prosecutor's questions were, at best, imprecise. Nonetheless, the trial court properly instructed the jury, pursuant to CALCRIM No. 1401, that to find the criminal street gang allegation true it had to conclude, among other elements, that one of the group's primary activities was the commission of certain enumerated felonies and "to qualify as a primary activity, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group." The issue, therefore, is not whether the prosecutor arguably misdefined primary activities in one or two of her questions but whether reasonable inferences from Detective Carias's testimony concerning the Ten Line Gangster Crips's commission of "murder, shootings, robberies, burglaries, narcotic sales" and his description of several specific predicate criminal acts by members of that gang constituted substantial evidence that commission of those crimes was one of the Ten Line Gangster Crips's primary activities. It did.

As to the first challenged question, the prosecutor began and then restarted her foundational question seeking to establish Detective Carias's experience and expertise to opine on the primary activities of the Ten Line Gangster Crips. Read in context, the question, "[A]re you familiar with the primary activities. In order—in other words, the types of crimes that are committed by the Ten Line Gangster Crips?" does not appear to be an attempt to define "primary activities," but was reasonably understood by Carias, and we believe the jury, simply to be the beginning of a short series of questions necessary to explain how he became aware of the gang's criminal history. (See *In re Alexander L.* (2007) 149 Cal.App.4th 605, 612 [gang expert's testimony cannot be considered substantial evidence as to the nature of the gang's primary activities because his testimony lacked an adequate factual foundation; testimony establishing the reliability of the expert's information was never elicited at trial]; see generally *People v. Margarejo* (2008) 162 Cal.App.4th 102, 107 [rejecting unreasonably restrictive interpretation of

11

prosecutor's questions and gang expert's answers; "[o]rdinary human communication often is flowing and contextual. Jurors know this."].)

With respect to the second challenged question, it was a mistake to ask about "the primary activities or the chief crimes" rather than to separate the question into its components: first asking what are the principal criminal activities of the Ten Line Gangster Crips and then asking whether commission of those crimes is one of the primary or chief activities or occupations of the gang. Despite the poor phrasing of the question, viewing the record in the light most favorable to the judgment, as we must, the jury could reasonably have understood that Detective Carias was not identifying the crimes most frequently committed by the Ten Line Gangster Crips without regard to whether commission of those crimes was one of the gang's primary or chief activities. Carias's testimony, moreover, cannot be reasonably construed as indicating the gang committed the predicate offenses only randomly and occasionally. He identified five categories of crimes as the primary activities or chief crimes committed by the Ten Line Gangster Crips, and used the plural form to describe "shootings, robberies, burglaries, narcotic sales." He also described specific examples of attempted murder and assault with a firearm, as well as sale of narcotics, committed by two other members of the Ten Line Gangster Crips. In sum, reasonable inferences from Detective Carias's testimony, if not the literal words themselves, constituted substantial evidence to support the jury's finding that the statutory criteria had been met.

**DISPOSITION**

The judgment is affirmed.

PERLUSS, P. J.

We concur:

SEGAL, J.  STROBEL, J.*

---

*  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article IV, section 6 of the California Constitution.

12